EDDIE R. KYLE, EMPLOYEE-PLAINTIFF v. HOLSTON GROUP, EMPLOYER-DEFENDANT, AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER-DEFENDANT

No. COA07-364

(Filed 19 February 2008)

**1. Workers' Compensation— settlement agreement—failure to include required biographical and vocational information**

The Industrial Commission erred in a workers' compensation case by failing to set aside a compromise settlement agreement based on a failure to comply with Industrial Commission Rule 502, and the case is reversed and remanded to the full Commission to enter an order vacating the approval of the agreement and for further proceedings as necessary, because: (1) plaintiff had not returned to work and was unrepresented at the time he entered into the agreement on 1 November 2004, and thus, the more specific requirements of Rule 502(2)(h) applied to the agreement; (2) defendants admit the agreement did not contain the required information including plaintiff's age, educational level, past vocational training, or past work experience, nor did it contain a certification that plaintiff was not claiming total wage

KYLE v. HOLSTON GRP.

[188 N.C. App. 686 (2008)]

loss due to his injury; (3) it was statutorily impermissible for the Commission to approve the agreement without the required biographical and vocational information when the statute states the required terms must be in the agreement itself in order to be approved; (4) while one purpose of Rule 502(2)(h) may be, as defendants contend, to make sure the Industrial Commission is privy to the information required by the rule, the rule also serves to ensure that an injured worker understands what he is signing off on and agreeing to; (5) the special deputy commissioner did not have all the information required by Rule 502(h)(2) when she did not receive a reply from plaintiff and did not verify with plaintiff the information contained in defense counsel's memo before approving the agreement; and (6) although the Commission could have approved the agreement without the language concerning plaintiff's biographical and vocational information had plaintiff certified in the agreement that he was not claiming total wage loss due to his injury, neither party disputed that the agreement contained no such certification. Further, the Court of Appeals did not need to determine whether the agreement should have been set aside under Rule 502(3)(a) based on the omission of medical records since the agreement should have been set aside for failure to contain all of the requirements of Rule 502(2)(h).

2. **Workers' Compensation— settlement agreement—Commission's failure to undertake full investigation to determine fairness**

The Industrial Commission erred in a workers' compensation case by failing to set aside a compromise settlement agreement based on the full Commission's failure to undertake a full investigation to determine if it was fair and just as required by N.C.G.S. § 97-17, and the case is reversed and remanded to the full Commission to enter an order vacating the approval of the agreement and for further proceedings as necessary, because: (1) plaintiff was unrepresented and unaware at the time of settling of his case that, under the law, he was entitled to the most favorable remedy available to him including total disability benefits if he was totally disabled; (2) the special deputy commissioner assumed, rather than determined, that plaintiff was knowledgeable about workers' compensation benefits, and particularly, his potential right to claim ongoing total disability benefits during the vocational rehabilitation process even beyond the 300 weeks or permanent total disability compensation under

N.C.G.S. § 97-29 if he were never able to return to suitable employment; (3) while it is not incumbent upon an insurance adjuster to explain the law to an unwitting claimant, the Industrial Commission must stand by to assure fair dealing in any voluntary settlement; (4) a full investigation into the fairness of the agreement necessarily required the special deputy commissioner to verify defense counsel's assertions regarding plaintiff's position on vocational rehabilitation and ability to return to work since the criterion for compensation in cases covered by N.C.G.S. §§ 97-29 or 97-30 is the extent of the claimant's incapacity for work; and (5) although defendants contend there was no evidence that plaintiff is totally disabled other than plaintiff's contentions regarding his inability to work, the evidence revealed otherwise.

Appeal by Plaintiff from Opinion and Award entered 10 January 2007 by the North Carolina Industrial Commission. Heard in the Court of Appeals 17 October 2007.

*Maynard & Harris, PLLC, by Celeste M. Harris, for Plaintiff.*

*Davis and Hamrick, L.L.P., by Shannon Warf Beach, for Defendants.*

STEPHENS, Judge.

## I. FACTS and PROCEDURE

Plaintiff Eddie R. Kyle suffered a work-related back injury on 6 August 2001 while employed as a truck driver by Defendant Holston Group. He was 46 years old at the time and his average weekly wages were $838.53. Defendant accepted responsibility for the injury, and Plaintiff did not retain legal counsel.

Following the injury, Plaintiff received medical treatment, including lumbar spinal fusion surgery performed 31 October 2001. Based on the results of a functional capacity evaluation performed 22 October 2002, Plaintiff was provided permanent, light-duty work restrictions which precluded his return to work as a truck driver, and the permanent partial impairment to his back was estimated to be 25 percent.

On or about 31 October 2003, Defendant Liberty Mutual Insurance Company, the Holston Group's insurance carrier, sent Plaintiff a letter offering $24,480.10 to settle the case. This sum represented per-

manent partial disability benefits based on a 10 percent rating to Plaintiff's back; three months' temporary total disability benefits; and $1,000 for future medical expenses. Plaintiff had sustained an earlier injury to his back with a different employer that also required surgical treatment, and he received a 15 percent permanent partial disability rating for that injury. Plaintiff's previous employer was also insured by Liberty Mutual, and Plaintiff negotiated a settlement of that earlier claim *pro se*. Plaintiff told Liberty Mutual, however, that he did not want to settle this case for anything less than the value of the full 25 percent rating.

On 17 August 2004, Amanda Price, an insurance adjuster assigned to Plaintiff's case, had telephone contact with Plaintiff. Claim file notes indicate that Ms. Price gave Plaintiff "specific information about [temporary partial disability] benefits remaining to him." Plaintiff testified he was advised by Ms. Price that he was entitled to receive a maximum of 300 weeks of benefits, and that at the time of their conversation, there were approximately 140 of those weeks remaining. Total disability benefits were never discussed.

Plaintiff contacted Ms. Price on 23 August 2004 to review temporary partial disability benefit calculations again. Plaintiff testified that Ms. Price offered to have someone meet with him for vocational testing, but no vocational services were ever initiated.

Ultimately, Plaintiff offered to settle for $63,000, basing this offer on work in a part-time capacity earning $100-$140 per week for the remaining weeks of temporary partial disability benefits. Ms. Price counter-offered with $60,000, and Plaintiff accepted.

A Compromise Settlement Agreement ("Agreement") was then drafted, signed, notarized, and submitted to Special Deputy Commissioner Maddox ("SDC Maddox") for approval. After reviewing the Agreement, SDC Maddox sent a memo to the parties requesting "documentation of any vocational rehabilitation efforts or a description of [Plaintiff's] work, educational or vocational training history." SDC Maddox also asked for clarification regarding Plaintiff's permanent partial disability rating, and asked that an addendum to the Agreement be drawn up to include social security disability offset language.

Defense counsel faxed a memo back to SDC Maddox stating that there were no vocational rehabilitation records because Plaintiff "decided to settle his claim and pursue future job placement on his

own when he feels he is ready to do so." The memo also stated that Plaintiff graduated from high school in 1973 and had worked in farming or as a truck driver ever since, and clarified Plaintiff's permanent partial disability rating. Defense counsel subsequently drafted an addendum, which Plaintiff signed and had notarized, regarding the social security disability offset, and submitted it to SDC Maddox.

Plaintiff testified that defense counsel contacted him regarding the memo from the Industrial Commission and told him that there were going to be some revisions to the Agreement. Although Plaintiff· received the Addendum, he testified he never saw the memo defense counsel submitted to SDC Maddox.

SDC Maddox did not verify with Plaintiff the information contained in defense counsel's memo, and neither the memo, nor the information contained therein, was incorporated into the Addendum or the Agreement. An Order Approving Compromise Settlement Agreement was entered on 8 December 2004.

Shortly thereafter, Plaintiff sought legal representation for a social security disability claim he had filed. Upon discussing the case with his attorney, Plaintiff learned that he might have been mistaken about the benefits he was entitled to receive under the Workers' Compensation Act. He also learned that the Agreement submitted to the Industrial Commission may have lacked certain information required by Industrial Commission Rule 502 when it was approved.

Upon learning this, Plaintiff filed a claim with the Industrial Commission seeking to set aside the Agreement and to vacate the order approving the Agreement. .After a hearing on 19 July 2005, Deputy Commissioner Myra L. Griffin entered an Opinion and Award denying Plaintiff's claim. Plaintiff appealed to the Full Commission and on 10 January 2007, the Full Commission entered an Opinion and Award affirming Deputy Commissioner Griffin's decision. From the Opinion and Award of the Full Commission, Plaintiff appeals.

## II. DISCUSSION

Appellate review of an Industrial Commission Opinion and Award is limited to a determination of whether the Full Commission's findings of fact are supported by any competent evidence, and whether those findings support the Full Commission's legal conclusions. *Adams v. AVX Corp.*, 349 N.C. 676, 509 S.E.2d 411 (1998), *reh'g denied*, 350 N.C. 108, 532 S.E.2d 522 (1999). "Findings of fact not sup-

ported by competent evidence are not conclusive and will be set aside on appeal." *Johnson v. Charles Keck Logging*, 121 N.C. App. 598, 600, 468 S.E.2d 420, 422, *disc. review denied*, 343 N.C. 306, 471 S.E.2d 71 (1996) (quotation marks and citation omitted). The Full Commission's conclusions of law are reviewable *de novo*. *Whitfield v. Lab. Corp.*, 158 N.C. App. 341, 581 S.E.2d 778 (2003).

### A. Compliance with Industrial Commission Rule 502

**[1]** Plaintiff first argues that the Full Commission erred by not setting aside the Agreement for failure to comply with Industrial Commission Rule 502. We agree.

Industrial Commission Rule 502 reads in relevant part:

(2) No compromise agreement will be approved unless it contains the following language or its equivalent:

. . . .

(h) Where the employee has not returned to a job or position at the same or a greater average weekly wage as was being earned prior to the injury or occupational disease, the agreement shall summarize the employee's age, educational level, past vocational training, [and] past work experience . . . . This subsection of the Rule shall not apply . . . if the employee is not represented by counsel, where the employee certifies that total wage loss due to an injury or occupational disease is not being claimed.

I.C. Rule 502(2)(h) (2000).

In *Smythe v. Waffle House*, 170 N.C. App. 361, 612 S.E.2d 345, *disc. review denied*, 360 N.C. 66, 621 S.E.2d 876 (2005), *appeal after remand*, 182 N.C. App. 754, 643 S.E.2d 407 (2007), a compromise settlement agreement between the parties indicated that the plaintiff, who was not represented by counsel, had not returned to work when she entered into the agreement. However, the settlement agreement contained no mention of the plaintiff's age, educational level, past vocational training, or past work experience, as required under Rule 502(2)(h). This Court concluded that "it was statutorily impermissible for the Commission [] to approve the settlement agreement without the required biographical and vocational information, and the Commission should have set aside its order of approval." *Id.* at 366, 612 S.E.2d at 349.

Likewise, here, Plaintiff had not returned to work and was unrepresented at the time he entered into the Agreement on 1 November 2004. Thus, the more specific requirements of Rule 502(2)(h) applied to the Agreement. However, as Defendants admit, "the [A]greement itself did not contain this information." It contained no mention of Plaintiff's age, educational level, past vocational training, or past work experience, nor did it contain a certification that Plaintiff was not claiming total wage loss due to his injury. Thus, as in *Smythe*, it was statutorily impermissible for the Commission to approve the Agreement without the required biographical and vocational information, and the Commission should have set aside its order of approval.

Defendants contend, however, that because SDC Maddox requested and received information regarding Plaintiff's age, education, vocational training, and past work experience prior to approving the Agreement, this was sufficient to comply with Rule 502 since "the purpose of the Rule is to make sure the Industrial Commission is privy to the information required by the Rule" and "all of the information required to approve an agreement was in the Industrial Commission file prior to the Order of Approval being entered." We do not find Defendants' argument persuasive.

While one purpose of Rule 502(2)(h) may be, as Defendants contend, "to make sure the Industrial Commission is privy to the information required by the Rule[,]" the Rule undoubtably also serves to ensure that, as SDC Maddox testified, "an injured worker [] understand[s] what he or she is signing off on and agreeing to." Furthermore, according to the rules of statutory construction, "[w]hen the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction." *Taylor v. J.P. Stevens Co.*, 307 N.C. 392, 396, 298 S.E.2d 681, 683 (1983) (quotation marks and citations omitted). "[I]t is a cardinal rule of statutory construction that significance and effect should . . . be accorded every part of the [statute], including every section, paragraph, sentence or clause, phrase, and word." *State v. Williams*, 286 N.C. 422, 432, 212 S.E.2d 113, 120 (1975) (quotation marks and citation omitted). Our Supreme Court has applied the rules of statutory construction to administrative regulations as well as statutes. *See States' Rights Democratic Party v. State Bd. of Elections*, 229 N.C. 179, 49 S.E.2d 379 (1948) and *State ex rel. Comm'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 269 S.E.2d 547 (1980) (applying rules of statutory construction to regulations in both cases).

Here, the language of Rule 502(2)(h) clearly and unambiguously states that "[n]o compromise agreement will be approved unless *it contains* the following *language or its equivalent*: . . . *the agreement* shall summarize the employee's age, educational level, past vocational training, [and] past work experience . . . ." (Emphasis added). Thus, according to the plain meaning of the regulation, the required terms must be in the agreement itself in order for the agreement to be approved by the Commission. Had the Industrial Commission intended that the specified information simply be submitted by defense counsel to the Commission prior to the approval of an agreement, as was the case here, the regulation would have been drafted similarly to Rule 502(3) which states: "All medical, vocational, and rehabilitation reports known to exist . . . must be *submitted with the agreement* to the Industrial Commission by the employer . . . ." Accordingly, as SDC Maddox correctly testified, since Rule 502 "does say that the agreement shall summarize" the factors identified in the Rule, the memo she received from defense counsel "wouldn't necessarily meet the specific requirements of that rule."

Furthermore, SDC Maddox did not have *all* the information required by Rule 502(2)(h) before approving the Agreement. While SDC Maddox requested the required information from the parties and received a reply memo from defense counsel, SDC Maddox did not receive a reply from Plaintiff and did not verify with Plaintiff the information contained in defense counsel's memo before approving the Agreement.

In the memo, defense counsel stated that "[t]here are no vocational rehabilitation reports. [Plaintiff] decided to settle his claim and pursue future job placement on his own when he feels ready to do so." However, Plaintiff testified that, contrary to defense counsel's assertions, he never told anyone that he would look for work on his own or that he thought he would be able to work after he settled his case. Although defense counsel sent Plaintiff the Addendum with the social security offset language, there is no competent evidence in the record before us that she sent Plaintiff a copy of the memo she faxed to SDC Maddox.[1] Further, it is undisputed that defense counsel did

---

1. On cross-examination, defense counsel asked Plaintiff questions tending to suggest that his insistence he never received a copy of the memo was not credible. It is well settled, however, that "questions asked by an attorney are not evidence." *State v. Taylor*, 344 N.C. 31, 41, 473 S.E.2d 596, 602 (1996). Here, the record contains no evidence to contradict Plaintiff's consistent and repeated testimony that he did not receive a copy of the memo, and that he "didn't talk to [defense counsel] about hunting [a] job." Morever, we note that, unlike the memo that SDC Maddox sent to the parties,

not incorporate the information from the memo into the Addendum, and did not revise the Agreement itself to incorporate the information contained therein. Consequently, neither Plaintiff nor SDC Maddox knew that the information SDC Maddox received contradicted Plaintiff's contentions.[2]

Accordingly, as Plaintiff's and defense counsel's responses regarding Plaintiff's vocational activities differed, and since SDC Maddox possessed only defense counsel's response, it cannot be accurately asserted that "[SDC] Maddox had every piece of information required by the Rules in front of her prior to her making the determination that the [A]greement should be approved."

Nevertheless, the Commission could have approved the Agreement without the language concerning Plaintiff's biographical and vocational information had Plaintiff certified in the Agreement that he was not claiming total wage loss due to his injury.[3] However, neither party disputes that the Agreement contained no such certification.

---

which specifically shows a "cc" to Plaintiff at his mailing address, the memo faxed to SDC Maddox by defense counsel contains no indication of any kind that a copy had been sent by any means to Plaintiff.

2. It cannot be credibly contended that the representation made in defense counsel's memo was insignificant to SDC Maddox's decision to approve the Agreement. She testified that such information "indicated to me that [Plaintiff] had made a decision to settle his claim . . . and that therefore it was time to close the claim." Likewise, it is undisputed that the information in defense counsel's memo caused SDC Maddox to believe that Plaintiff "was not interested in participating in vocational rehabilitation." This belief is belied not only by Plaintiff's testimony, but also by Liberty Mutual's claim file notes, admitted into evidence at the hearing, which document that (1) upon initially being advised by a Liberty Mutual adjuster that someone would be sent to meet with him for vocational testing, Plaintiff invited that person to come to his home for the meeting, and (2) during Ms. Price's discussions with Plaintiff regarding settlement, he told her he was still trying to decide if he should settle or "try voc." This was in late August 2004 when Ms. Price described Plaintiff as being "still very confused and concerned. . . ." Ms. Price told Plaintiff he "need[ed] to make a choice . . . before September is out." When she next spoke with Plaintiff on 13 September 2004, he was "still trying to do some 'figuring' to come up with a number to give [her]." He also told her that "many of the places he was interested in working" had told him he would not be able to work in "those fields" because of his narcotic medication. This evidence does not support SDC Maddox's belief, formed on the basis of the representation in defense counsel's memo, that Plaintiff had no interest in vocational rehabilitation.

3. It is likely that Plaintiff would have so certified because, based on his review of the Industrial Commission's website and his discussions with Ms. Price, he believed he was only entitled to the remaining weeks available for temporary partial disability. As he testified, "[A]fter 300 weeks [from the date of injury], I was through with it. . . . That was all. . . . [T]he total thing."

Therefore, because the Agreement did not contain all the terms required by Rule 502(2)(h), the Commission erred by not setting aside the Agreement.

Plaintiff further contends that the Commission erred by not setting aside the Agreement for failure to comply with Industrial Commission Rule 502(3)(a). Pursuant to Rule 502(3)(a), "[n]o compromise agreement will be considered unless . . . all medical, vocational, and rehabilitation reports known to exist . . . [are] submitted with the agreement to the Industrial Commission . . . ." I.C. Rule 502(3)(a) (2000).[4] Since we hold that the Agreement should have been set aside because it did not contain all of the terms required by Industrial Commission Rule 502(2)(h), we need not determine whether the Agreement should have been set aside because medical records were omitted.

## B. Full Investigation

[2] Plaintiff next argues that the Agreement should have been set aside because the Full Commission failed to undertake a full investigation to determine if the Agreement was fair and just, as required by N.C. Gen. Stat. § 97-17. Under the circumstances, we agree.

All settlement agreements[5] must be filed with and approved by the Commission. N.C. Gen. Stat. § 97-17(a) (2003). "The Commission shall not approve a settlement agreement . . . unless . . . [t]he settlement agreement is deemed by the Commission to be fair and just . . . ." N.C. Gen. Stat. § 97-17(b)(1) (2003). The Commission is required to undertake a "full investigation" to determine that a settlement agreement is fair and just "in order to assure that the settlement is in accord with the intent and purpose of the Act that an injured employee receive the disability benefits to which he is entitled . . . ." *Vernon*, 336 N.C. at 432, 444 S.E.2d at 195; *accord Smythe*, 170 N.C. App. at 364, 612 S.E.2d at 348.

The Workers' Compensation Act provides two basic categories of benefits as the result of an injury by accident: (1) indemnity ben-

---

4. Effective 1 August 2006, Rule 502(3)(a) was modified as follows: "The material medical, vocational, and rehabilitation reports known to exist . . . must be submitted with the agreement to the Industrial Commission by the employer . . . ." However, as the Agreement was signed 1 November 2004 and approved 8 December 2004, the previous version of Rule 502(3)(a) applies.

5. Pursuant to N.C. Gen. Stat. §§ 97-17 and 97-82, the Commission recognizes two forms of voluntary settlement agreements, namely, the compensation agreement in uncontested cases, and the compromise or "clincher" agreement in contested or disputed cases. *Vernon v. Steven L. Mabe Builders*, 336 N.C. 425, 444 S.E.2d 191 (1994).

efits for loss of wage-earning capacity under N.C.G.S. § 97-29 (total incapacity) or N.C.G.S. § 97-30 (partial incapacity) and (2) benefits for physical impairment, without regard to its effect on wage-earning capacity, under N.C.G.S. § 97-31 (schedule of injuries). N.C.G.S. §§ 97-29 and 97-30 are alternate sources of compensation for an employee who suffers an injury which is also included under the schedule of injuries found in N.C.G.S. § 97-31. The employee is allowed to select the more favorable remedy.

*Effingham v. Kroger Co.*, 149 N.C. App. 105, 113-14, 561 S.E.2d 287, 293 (2002) (internal citations omitted).

In *Vernon*, the Supreme Court held that the Industrial Commission failed to conduct a full investigation to determine the fairness of a Form 26 compensation agreement. The plaintiff sustained a compensable back injury and received temporary total disability benefits. Upon reaching maximum medical improvement, the plaintiff's physician rated the plaintiff as having a 15 percent permanent disability to his back, but stated that he did not think the plaintiff could return to work. *Vernon*, 336 N.C. 425, 444 S.E.2d 191.

The defendant's insurance adjuster sent the plaintiff a Form 26 compensation agreement stating that the plaintiff was entitled to 45 weeks of compensation under N.C. Gen. Stat. § 97-31. The plaintiff, unrepresented and unaware at the time that he had any other choice, signed the agreement. Defendant submitted the agreement to the Commission for approval. An employee in the claims department compared the rating listed on the form against the physician's report attached thereto, verified the payment information, and approved the agreement. Our Supreme Court stated that the Commission employee "apparently assumed, rather than determined, that [the] plaintiff was knowledgeable about workers' compensation benefits, and, particularly, his right to claim permanent total disability compensation under section 97-29 rather than permanent partial disability compensation under section 97-31." *Id.* at 434, 444 S.E.2d at 195-96. Thus, the Court held that, in approving the agreement, the Commission did not, as the statute requires, act in a judicial capacity to determine the fairness of the agreement. *Vernon*, 336 N.C. 425, 444 S.E.2d 191.

Here, as in *Vernon*, Plaintiff was unrepresented and unaware at the time of settling his case that, under the law, he was entitled to the most favorable remedy available to him, including total disability benefits if he was totally disabled. At the time of Ms. Price's conversation with Plaintiff regarding settlement of his claim, claim file notes indi-

KYLE v. HOLSTON GRP.

[188 N.C. App. 686 (2008)]

cated the following: the minimum settlement value of the claim was $18,448.65, representing the 10 percent permanent partial disability rating to Plaintiff's back; Plaintiff could be entitled to 300 weeks of temporary partial disability benefits, with approximately 143 weeks remaining; Plaintiff had not been vocationally rehabilitated; and "if [Plaintiff] fails voc[ational] rehab[ilitation] he could potentially receive lifetime benefits" valued at approximately $811,069.74. Plaintiff testified that Ms. Price advised him he was entitled to receive a maximum of 300 weeks of benefits, and that at the time of their conversation, there were only approximately 140 of those weeks remaining. Although Plaintiff had not returned to work, Ms. Price's settlement figure of $60,000 was based on an anticipated earning capacity in part-time work at minimum wage for those estimated remaining weeks.[6] At no point did Ms. Price indicate to Plaintiff that he would be entitled to benefits beyond 300 weeks under N.C. Gen. Stat. § 97-29 if he were unable to earn any wages as a result of his injury. Plaintiff, obviously unaware that he potentially had other remedies under the law, agreed to settle his claim based on the limited information provided by Ms. Price.

Furthermore, similar to *Vernon*, SDC Maddox apparently assumed, rather than determined, that Plaintiff was knowledgeable about workers' compensation benefits, and, particularly, his potential right to claim ongoing total disability benefits during the vocational rehabilitation process even beyond 300 weeks, or permanent total disability compensation under N.C. Gen. Stat. § 97-29 if he were never able to return to suitable employment.

SDC Maddox testified as follows:

Q. . . . Would you have approved this compromise settlement agreement, Ms. Maddox, for the amount paid if you had known that [Plaintiff] was unaware of his right to 97-29 benefits?

. . . .

A. Probably not.

Q. And why is that?

A. I would have wanted to see, before I could have approved that—with that knowledge, specific knowledge, I would have

6. Apparently, neither Ms. Price nor Plaintiff questioned whether a part-time job paying $100-$140 per week to a man who was earning more than $800 per week when he was injured would legally constitute suitable employment.

wanted to see what his lifetime benefits would have been on that and get a present value on this agreement.

. . . .

Q. . . . [I]f that lifetime benefit would yield $851,000, do you feel that this compromise settlement agreement for $60,000, assuming that he would never be able to return to work, is fair and just?

. . . .

A. Assuming that, it probably wouldn't be. But that wasn't my understanding of what was happening.[7]

While it is not incumbent upon an insurance adjuster to explain the law to an unwitting claimant, the Industrial Commission must stand by to assure fair dealing in any voluntary settlement. *Biddix v. Rex Mills, Inc.*, 237 N.C. 660, 75 S.E.2d 777 (1953). Thus, in this case, a full investigation to determine that the Agreement was fair and just required SDC Maddox to determine, rather than assume, that Plaintiff was aware of his remedies under the law.

Furthermore, "in order to assure that . . . an injured employee receive[s] the disability benefits to which he is entitled," *Vernon*, 336 N.C. at 432, 444 S.E.2d at 195, the Commission must scrutinize carefully a settlement agreement that provides for a claimant to accept the lesser of two remedies for which he may qualify. Here, since the Agreement stated that Plaintiff had not returned to work, SDC Maddox requested from the parties "information that would show what the likelihood was that [Plaintiff] would be able to [work] at some point in the future; and, if so, when." She received defense counsel's memo which indicated to her that Plaintiff "did not wish to participate in vocational rehabilitation[,]" and that Plaintiff felt he was capable of finding work in another occupation on his own. However, SDC Maddox did not contact Plaintiff to confirm defense counsel's information or her own assumptions based on that information. Since "the criterion for compensation in cases covered by G.S. 97-29 or -30 is the extent of the claimant's 'incapacity for work[,]' " *Little v. Anson Cty. Sch. Food Serv.*, 295 N.C. 527, 533, 246 S.E.2d 743, 747 (1978), a full investigation into the fairness of the Agreement necessarily required SDC Maddox to verify defense coun-

---

7. When asked whether she was "pretty much looking at [Plaintiff's] case as a scheduled injury case versus a permanent and total disability case," SDC Maddox replied, "Uh-huh (yes). Yes."

sel's assertions regarding Plaintiff's position on vocational rehabilitation and ability to return to work.

Although Defendants contend that there is no evidence, other than Plaintiff's contentions regarding his inability to work, that Plaintiff is totally disabled, the undisputed evidence establishes the following: Plaintiff had not returned to work when he entered into the Agreement on 1 November 2004, approximately three years and three months after his compensable injury. Defendant Holston Group was unable to hold Plaintiff's truck driving position open, and terminated Plaintiff as an employee on 9 April 2002. A functional capacity evaluation performed 22 October 2002 indicated that Plaintiff's overall level of work capability was "light" and that "it is difficult to predict whether [Plaintiff] is capable of sustaining the Light level of work for an 8-hour day." The evaluation further indicated that Plaintiff "may be able to return to work if" he can avoid squatting, kneeling, and lifting more than 20 pounds, and if his work schedule is modified through shorter shifts.[8] Although Plaintiff was released by his treating physician, Dr. Daubert, to return to work under the permanent restrictions identified by the evaluation, Dr. Daubert stated it was "unlikely that [Plaintiff] can return to work as he did prior driving a truck." Before his injury, Plaintiff had worked only as a farmer and a truck driver.

On 9 September 2003, Dr. Daubert assigned a 25 percent permanent partial disability rating to Plaintiff's back. However, in light of Plaintiff's continued pain and inability to drive a car for any period of time, Dr. Daubert also recommended further surgery to remove the hardware in Plaintiff's back. Plaintiff was taking Ambien to help him sleep, Hydrocodone for his pain, and Celebrex and Bextra for inflammation. Although Plaintiff had researched jobs that he may have been qualified to do, including working at Wal-Mart or as a grocery store deli worker, because of his narcotic pain medication, he was worried about finding work where drug testing was required, and "many" employers he had contacted for work told him he was not eligible for employment with them because of his use of narcotic medication.

Defendant Liberty Mutual sent a field investigator to observe Plaintiff several times under the guise of completing a "[y]early activity check to verify [Plaintiff] is alive and receiving benefits checks."

___

8. During testing, Plaintiff "required frequent rest periods due to increased radicular pain symptoms." Although rest initially decreased his symptoms, "with increased activity, [Plaintiff was] unable to resolve symptoms."

The field investigator's report from his visit to Plaintiff's residence on 24 March 2004 stated:

> In observing [Plaintiff] he appears to be walking very slowly and with a slight limp. On 2 occasions during our meeting he went back to his bedroom to get his medications to show me and on coming back to the living room appeared winded from the short walk down the hall. I could find no evidence that [Plaintiff] is currently active and no recommendations at this time.
>
> . . . .
>
> No red flag indicators found.

This evidence raises questions as to whether Plaintiff may have been entitled to total disability benefits under N.C. Gen. Stat. § 97-29 instead of benefits under N.C. Gen. Stat. §§ 97-30 or 97-31. While SDC Maddox testified that "the amount [of the Agreement] seemed to be a fair amount to cover a scheduled injury[,]" a full investigation into the fairness of this Agreement necessarily required SDC Maddox to inquire into the possibility that this case was a total disability case rather than a scheduled injury or partial disability case. This she could have accomplished by seeking to verify with Plaintiff the information in defense counsel's memo, particularly given the fact that the memo contains no indication it had been sent to Plaintiff.[9]

Accordingly, we hold that the Full Commission's determination that "Special Deputy Commissioner Maddox acted in a judicial capacity and made a full investigation in reviewing the Agreement submitted by the parties" is not supported by competent evidence. We conclude that it was statutorily impermissible for the Commission here to approve the Agreement, and the Commission should have set aside its order of approval.

For the above-stated reasons, we reverse and remand to the Full Commission to enter an order vacating the approval of the settlement agreement, and for further proceedings as necessary.

REVERSED.

Judges CALABRIA and ARROWOOD concur.

---

9. The memo did, however, provide Plaintiff's telephone number if SDC Maddox "would like to speak with him directly."