STATE v. RICHARDSON

[226 N.C. App. 292 (2013)]

---

STATE OF NORTH CAROLINA
v.
RODERICK TYNELL RICHARDSON

No. COA11-1581-2

Filed 2 April 2013

**Constitutional Law—right to remain silent—improper questioning of defendant—improper closing argument**

The trial court committed plain error in an assault with a deadly weapon with intent to kill inflicting serious injury and possession of a firearm by a convicted felon case by allowing the State to cross-examine defendant about his failure to make a post-arrest statement to investigating officers and to comment on defendant's decision to refrain from giving such a statement during the prosecutor's closing argument. The case was remanded for a new trial.

Appeal by defendant from judgments entered 19 November 2010 by Judge Yvonne Mims Evans in Mecklenburg County Superior Court. Heard in the Court of Appeals 9 May 2012, with an opinion finding no error in the trial court's judgments filed on 21 August 2012. On remand

from the Supreme Court of North Carolina stemming from an order entered on 17 December 2012.

*Attorney General Roy Cooper, by Special Deputy Attorney General Phillip K. Woods, for the State.*

*Parish & Cooke, by James R. Parish, for Defendant-appellant.*

ERVIN, Judge.

Defendant Roderick Tynell Richardson appeals from judgments entered based upon his convictions for two counts of assault with a deadly weapon with intent to kill inflicting serious injury and one count of possession of a firearm by a convicted felon. On appeal, Defendant argues, among other things, that the trial court committed plain error by allowing the prosecutor to question him and to make comments to the jury concerning his decision to refrain from making a statement to investigating officers. After careful consideration of Defendant's challenge to the trial court's judgments in light of the remand instructions that we have received from the Supreme Court, the record, and the applicable law, we conclude that Defendant is entitled to a new trial.

## I. Factual Background

### A. Substantive Facts

#### 1. State's Evidence

On the early morning of 20 May 2009, Sherman Cunningham was employed as a bouncer by the Carousel Club, an establishment located on South Boulevard in Charlotte. Mr. Cunningham's duties included checking patrons for guns, drugs, and other undesirable items. Defendant; his friend, Richard Snowden; Marcus Kinard; and Carousel Club employees Bryan Herron, Darwin Springs, and Lakeshia Reed were also present at the Carousel Club.

Although Mr. Kinard and Ms. Reed had once been involved in a romantic relationship, Defendant and Ms. Reed had begun dating after the Kinard-Reed relationship ended. During the evening, Ms. Reed became angry because Defendant was speaking with a dancer known as "Egypt." According to Mr. Cunningham, Ms. Reed had become intoxicated and was flirting with both Defendant and Mr. Kinard.

As the club was closing, Mr. Cunningham saw Defendant enter the passenger side of a car operated by Mr. Snowden which drove away

from the club. Upon returning, Defendant approached Mr. Cunningham to ask about giving "Egypt" a ride home. At about the same time, Mr. Kinard was leaving with Ms. Reed, who kept getting out of Mr. Kinard's car and attempting to start a fight with "Egypt." After Defendant told Ms. Reed to come with him instead, Defendant and Mr. Kinard began arguing.

As Defendant approached Mr. Kinard, Mr. Cunningham saw the butt of a gun protruding from Defendant's pants. After noticing the gun, Mr. Cunningham "told [Defendant] that he needed to go back to the car with that" and informed both men that "this was a stupid argument." As the dispute "escalated," "[Mr. Kinard] stepped closer" and "hit [Defendant]" with his hand. After Mr. Kinard hit him, Defendant "pulled out his gun and started shooting," at which point Mr. Cunningham "jumped behind a car," where he remained during "the time that everybody was shooting." In addition, Mr. Snowden "went to his pocket like he had a gun." As "[Mr. Kinard] was running away[, Defendant] was still shooting at him" despite the fact that Mr. Kinard was unarmed. Defendant left the Carousel Club with Mr. Snowden after the shooting.

Mr. Springs, the head of security for the Carousel Club, testified that, on the evening of 20 May 2009, he was carrying a nine millimeter Glock handgun. After the Carousel Club closed, Mr. Springs went to the parking lot, where he saw a small crowd that included Defendant, Mr. Cunningham, and Mr. Herron. As Mr. Springs approached Defendant, who had been walking towards his car, Defendant "reversed direction and came towards [Mr. Kinard]" even though Mr. Springs was between the two men. Although Mr. Springs tried to stop the men from arguing, Mr. Kinard "was able to reach over the group" and "smack the Defendant." At that point, Mr. Springs "saw the gun being pulled from the waist area of the Defendant," who "began firing" and hit Mr. Kinard. In response, Mr. Springs fired a shot at Defendant, who turned and shot at Mr. Springs. After firing that shot, Mr. Springs' gun jammed, causing him to attempt to hide behind his car. As Mr. Springs ducked behind his vehicle, he was hit in the arm and, about "two seconds" later, in his leg. Although Mr. Springs did not see who shot him, he had seen Defendant and Mr. Herron, but not Mr. Kinard, in the possession of firearms.

Mr. Kinard testified that he went to the Carousel Club on 20 May 2009 to give some CDs to the substitute disk jockey, Mr. Herron. Mr. Kinard, who denied having had a firearm in his possession that evening, had several drinks during his time at the Carousel Club. Mr. Kinard had "messed around off and on for years" with Ms. Reed. Although he had heard that Defendant and Ms. Reed had "messed around," Mr. Kinard "didn't have any problems with that."

After the Carousel Club closed, Mr. Kinard went to the parking lot, where Ms. Reed told him that she would see him later. At that point, Defendant advised Ms. Reed to refrain from speaking with Mr. Kinard. After the two men began arguing, Defendant "flashed a gun" and said, "I've got you." In response, Mr. Kinard removed his jacket and approached Defendant. Although Mr. Cunningham positioned himself between the two men and urged them not to fight, Mr. Kinard stepped "to the side" and "slapped [Defendant]" on the face. At that point, Defendant shot Mr. Kinard "right above [his] ankle" and "above [his] knee." As Mr. Kinard tried to "get behind the car," Defendant "hit [him] four more times."

Mr. Herron testified that, after the Carousel Club closed on 20 May 2009, he retrieved a gun from his truck and started smoking a cigarette in the parking lot. As he stood there, Mr. Herron observed that Defendant and Mr. Kinard had begun arguing about Ms. Reed. As the argument continued, the two men "got closer to each other and the next thing you know [Mr. Kinard] slapped [Defendant]." After Defendant "flashed a gun," Mr. Kinard, who was unarmed, removed his coat and placed it on a car. At that point, when "[Mr. Springs] was about in the middle of [Defendant and Mr. Kinard,]" "[Defendant] pulled out a gun and pointed it at [Mr. Kinard,]" "started shooting from there," and continued to fire at Mr. Kinard even after Mr. Kinard had fallen. When Mr. Herron "saw that [Defendant] wasn't going to stop shooting, [he] pulled [his] gun up and started shooting at [Defendant.]"

At approximately 2:30 a.m. on 20 May 2009, Joseph Willinsky, a Charlotte-Mecklenburg Police Department crime scene investigator, went to the Carousel Club parking lot. At that location, Officer Willinsky collected a Smith and Wesson handgun, a Glock handgun containing several rounds of ammunition and one jammed bullet, and various other items, including bullets and spent shells. More specifically, Officer Willinsky collected several projectiles that had become embedded in a green Ford pick-up truck and a number of nine millimeter and .45 caliber shell casings. According to Todd Nordhoff, a firearms examiner with the Charlotte-Mecklenburg Police Department, the weapons recovered from the parking lot were both 9 millimeter firearms, while the bullets that were removed from Mr. Kinard's leg had been fired from a .45 caliber handgun.

### 2. Defendant's Evidence

Mr. Snowden, who had been convicted of conspiracy to commit murder in Connecticut in 1999, testified that he and Defendant had been friends for several years and regularly patronized the Carousel Club. At

STATE v. RICHARDSON

[226 N.C. App. 292 (2013)]

around 11:30 p.m. on 20 May 2009, Mr. Snowden and Defendant travelled to the Carousel Club in Mr. Snowden's car, where Mr. Snowden had "quite a few drinks" and talked to girls he knew. When the club closed at around 2:00 a.m., Mr. Snowden went to his car while Defendant waited for a dancer named "Egypt" to finish work. After Defendant emerged from the Carousel Club, Mr. Snowden drove Defendant to a nearby gas station before returning to the Carousel Club parking lot.

Upon their return, Defendant got out and walked towards the door from which "Egypt" was expected to emerge. At that point, Mr. Snowden noticed that Mr. Kinard was also in the parking lot. For that reason, Mr. Snowden got out of his car, approached Defendant and Mr. Kinard, and argued with Mr. Kinard. According to Mr. Snowden, there was "just a whole bunch of commotion," during which Mr. Snowden, who did not have a gun, was shot from behind by an unknown assailant. Despite the fact that Defendant "did not have a weapon out," Mr. Snowden saw Mr. Herron "push[ Defendant] in the head" with what he thought was a gun. Mr. Snowden believed that Mr. Springs had a weapon in his possession as well. Mr. Snowden never saw Defendant either have a gun in his possession or fire a shot. After being shot, Mr. Snowden and Defendant drove to a nearby hospital for treatment.

Defendant testified that he and Mr. Snowden went to the Carousel Club on 20 May 2009 "to get a female." In view of the fact that Mr. Kinard and Ms. Reed had previously been involved in a romantic relationship, Mr. Kinard bore a certain amount of animosity toward Defendant after he started dating Ms. Reed. At the club, Defendant persuaded "Egypt" to return home with him after work. Defendant's activities angered Ms. Reed, who attempted to fight "Egypt" after the club closed.

At the end of the evening, Defendant and Mr. Snowden went to a nearby gas station for the purpose of buying condoms and then returned to the Carousel Club parking lot to wait for "Egypt." As the women exited the club, there was a "commotion" between Ms. Reed and "Egypt," leading Defendant to get out of the car. However, a Carousel Club employee annoyed Defendant by telling him that "Egypt" could not go with him. At that point, Mr. Kinard "started directing all of his aggressions towards [Defendant] and he started taking his coat and his stuff off." Although Defendant did not approach Mr. Kinard or have any desire to fight with him, Mr. Kinard was "calling names" and making "derogatory remarks" about Defendant.

As Mr. Kinard approached Mr. Snowden, the two "squared off" and "the commotion started." Defendant attempted to pull Mr. Snowden

STATE v. RICHARDSON

[226 N.C. App. 292 (2013)]

away from Mr. Kinard, saying "Man, this ain't worth it." Defendant did not flash a gun or have a firearm in his possession. As Defendant "started pulling [Mr. Snowden] back," his friend "kind of fell and [Defendant] ran." After Mr. Snowden was shot, Defendant reentered Mr. Snowden's car, at which point he discovered that he had been shot in the leg, chest, and back. At the hospital, law enforcement officers performed a gunshot residue test on Defendant's hands and arms.

Although Ms. Reed was employed as a bartender at the Carousel Club, she went to that establishment as a customer on 20 May 2009. At the Carousel Club, Ms. Reed drank shots of whiskey until she was "drunk." Upon noticing that Defendant had been talking with another woman, Ms. Reed made a rude gesture towards Defendant. After the other woman called Ms. Reed an offensive name, the two women began arguing.

Ms. Reed left the building at about the same time as Mr. Kinard. After going outside, Ms. Reed realized that Mr. Snowden and Mr. Kinard were about to fight. For that reason, Ms. Reed grabbed Mr. Snowden's arm while a friend tried to restrain Mr. Kinard. As Ms. Reed understood the situation, the fight was between Mr. Snowden and Mr. Kinard, although Defendant had also approached the two men. When Ms. Reed grabbed Mr. Snowden's arm, he "snatched away" and she heard gunshots. As a result, Ms. Reed "just automatically got down and [] didn't see anything." Ms. Reed never saw anyone, including Defendant, with a firearm.

Although Starnecca Brown had previously worked at the Carousel Club, she was present at that location as a customer on 20 May 2009. Ms. Brown left the club at the same time as Ms. Reed and Mr. Kinard. When the group got outside, Ms. Reed began arguing with another woman, causing Ms. Brown to attempt to "calm her down." After Mr. Kinard became upset, Ms. Brown saw him taking off his jacket. Despite the fact that Ms. Brown heard Mr. Snowden and Mr. Kinard arguing, she could not see them. According to Ms. Brown, "[t]hey was arguing and so much commotion outside, so much arguing, and about a few minutes later after the argument started, shots were fired." At the time these shots were fired, Ms. Brown was talking with Defendant.

## B. Procedural History

On 20 May 2009, Defendant was arrested for assaulting Mr. Springs and Mr. Kinard with a deadly weapon with the intent to kill inflicting serious injury. On 8 June 2009, the Mecklenburg County grand jury returned bills of indictment charging Defendant with assaulting Mr. Kinard and Mr. Springs with a deadly weapon with the intent to kill inflicting serious injury. On 30 November 2009, the Mecklenburg County grand jury

returned a bill of indictment charging Defendant with possession of a firearm by a convicted felon.

The charges against Defendant came on for trial at the 15 November 2010 criminal session of the Mecklenburg County Superior Court. At the conclusion of the trial, the jury convicted Defendant as charged. Based upon the jury's verdicts, the trial court sentenced Defendant to sixteen to twenty months imprisonment for possession of a firearm by a convicted felon, consolidated the two felonious assault charges for judgment, and sentenced Defendant to a consecutive term of 112 to 144 months imprisonment for assaulting Mr. Kinard and Mr. Springs with a deadly weapon with the intent to kill inflicting serious injury. Defendant noted an appeal to this Court from the trial court's judgments.

On 21 August 2012, this Court filed an unpublished opinion in *State v. Richardson*, __ N.C. App. __, 731 S.E.2d 275, 2012 N.C. App. LEXIS 999 (2012), finding no error in the trial court's judgments. On 21 September 2012, Defendant, acting *pro se*, filed a notice of appeal seeking review of this Court's decision by the Supreme Court of North Carolina. On 3 October 2012, the State filed a motion to dismiss Defendant's notice of appeal for lack of a substantial constitutional question. On 17 December 2012, the Supreme Court entered an order "allow[ing] Defendant's "Notice of Appeal for the limited purpose of remanding to the Court of Appeals for reconsideration in light of our decision in *State v. Moore*, __ N.C. __, 726 S.E.2d 168 (2012)." After conducting the additional review required by the Supreme Court on remand, we now file the present opinion, in which we grant Defendant a new trial.[1]

### II.  Questions and Comments Concerning Defendant's Silence

In his brief, Defendant argues that the trial court committed plain error by allowing the State to cross-examine him about his failure to make a post-arrest statement to investigating officers and to comment on his decision to refrain from giving such a statement during

---

1. In his initial brief before this Court, Defendant also argued that the trial court erroneously failed to exercise its discretion in responding to the jury's request to review two witness statements during the course of its deliberations and that the trial court erred by denying his motion to dismiss the charge that he assaulted Mr. Springs with a deadly weapon with the intent to kill inflicting serious injury. We rejected both of these contentions in our initial, unpublished opinion. In view of the fact that the only issue raised in Defendant's notice of appeal was the one discussed in the text of this opinion and the fact that the Supreme Court only required us to reconsider one of these three claims on remand, we conclude that our initial opinion remains in effect with respect to the claims that were not mentioned in the Supreme Court's remand order and that we need not revisit our disposition of either of those claims at this time.

the prosecutor's closing argument. In response, the State argues that the challenged prosecutorial questions and comments all implicated Defendant's pre-arrest, rather than post-arrest, silence and did not, in any event, rise to the level of plain error.[2] After conducting the additional review on remand required by the Supreme Court, we conclude that Defendant's contention has merit.

## A. Applicable Legal Principles

> A criminal defendant's right to remain silent is guaranteed under the Fifth Amendment to the United States Constitution and is made applicable to the states by the Fourteenth Amendment. "We have consistently held that the State may not introduce evidence that a defendant exercised his [F]ifth [A]mendment right to remain silent." If a defendant has been given his Miranda warnings, "his silence may not be used against him." The rationale underlying this rule is that "[t]he value of constitutional privileges is largely destroyed if persons can be penalized for relying on them."

*State v. Moore*, __ N.C. __, __, 726 S.E.2d 168, 172 (2012) (citing *State v. Ward*, 354 N.C. 231, 250, 555 S.E.2d 251, 264 (2001) (internal citation omitted), and quoting *State v. Ladd*, 308 N.C. 272, 283, 302 S.E.2d 164, 171 (1983) (internal citations omitted), *State v. McCall*, 286 N.C. 472, 484, 212 S.E.2d 132, 139 (1975) (internal citations ommitted, and *Grunewald v. United States*, 353 U.S. 391, 425, 77 S. Ct. 963, 984-85, 1 L. Ed. 2d 931, 955 (1957) (Black, J., Warren, C.J., Douglas & Brennan, JJ., concurring)). As a result, the extent to which "the State may use a defendant's silence at trial depends on the circumstances of the defendant's silence and the purpose for which the State intends to use such silence." *State v. Boston*, 191 N.C. App. 637, 648, 663 S.E.2d 886, 894, *disc. review denied*, 362 N.C. 683, 670 S.E.2d 566 (2008).

> In Boston, this Court explained that a defendant's pre-arrest silence and post-arrest, pre-*Miranda* warnings silence may not be used as substantive evidence of guilt, but may be used by the State to impeach the defendant by suggesting that the defendant's prior silence is inconsistent with his present statements at trial. A defendant's post-arrest,

---

2. The State has not argued that Defendant opened the door to the challenged questions and comments, so we will not address the extent to which any such contention would have been meritorious.

> post-*Miranda* warnings silence, however, may not be used
> for any purpose. Because different law applies to the differ-
> ent circumstances surrounding the testimony challenged by
> defendant, we [must] analyze each circumstance separately.

*State v. Mendoza*, 206 N.C. App. 391, 395, 698 S.E.2d 170, 173-74 (2010) (citing *Boston*, 191 N.C. App at 648-49, 663 S.E.2d at 894, and *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 2245, 49 L. Ed. 2d 91, 98 (1976)).

At trial, Defendant failed to object to most of the questions and prosecutorial comments upon which his request for appellate relief is predicated. In addition, the limited number of objections that Defendant did make at trial did not include any reference to the constitutional principle upon which he now relies.[3] As a result, our review of Defendant's challenge to the relevant prosecutorial questions and comments is limited to determining whether plain error occurred. *Mendoza*, 206 N.C. App. at 395, 698 S.E.2d at 174 (stating that, since defendant "did not [] object to any of this testimony at trial," "we, therefore, review the admission of the testimony only for plain error").[4]

" 'For error to constitute plain error, a defendant must demonstrate' that, after examination of the entire record, the error 'had a probable impact on the jury's finding that the defendant was guilty.' " *State v. Lawrence*, __ N.C. __, __, 723 S.E.2d 326, 334 (2012) (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982), *cert. denied*, 459 U.S. 1018, 103 S. Ct. 381, 74 L. Ed. 2d 513 (1982)).

> The plain error rule applies only in truly exceptional cases.
> Before deciding that an error by the trial court amounts to

---

3. The hearsay-based objections that Defendant lodged at trial were, for the most part, sustained. At the beginning of Defendant's trial, the trial court specifically instructed the jury that, "[w]hen the Court sustains an objection to a question," it should "disregard the question and the answer if one has been given[.]" "Absent circumstances indicating otherwise, jurors are presumed to follow a trial court's instructions." *State v. McQueen*, 165 N.C. App. 454, 458, 598 S.E.2d 672, 676 (2004) (internal citation omitted), *disc. review denied*, 359 N.C. 285, 610 S.E.2d 385 (2005). As a result, we will presume that the jury disregarded the questions and any ensuing answers to which the trial court sustained Defendant's objections.

4. Although Defendant contends at various points in his brief that he is entitled to relief from his convictions on the basis of the challenged prosecutorial questions and comments "unless the Appellate Court finds that it was harmless beyond a reasonable doubt," his admitted failure to object to most of the questions and comments which underlie his challenge to the trial court's judgments relegate him to plain error review, a fact which he appears to acknowledge in other parts of his brief.

"plain error," the appellate court must be convinced that[,] absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question "tilted the scales" and caused the jury to reach its verdict convicting the defendant. Therefore, the test for "plain error" places a much heavier burden upon the defendant than that imposed by N.C. [Gen. Stat.] § 15A-1443 upon defendants who have preserved their rights by timely objection.

State v. Walker, 316 N.C. 33, 39, 340 S.E. 2d 80, 83 (1986) (citing Odom, 307 N.C. at 661, 300 S.E. 2d at 378-379, and quoting State v. Black, 308 N.C. 736, 741, 303 S.E. 2d 804, 806-807 (1983)). In deciding whether the admission of evidence relating to or a decision to allow a prosecutor to comment upon the fact that a defendant exercised his right to remain silent constituted plain error, "[c]onsideration of the way in which the evidence was presented or the prosecutor's use of the evidence is relevant to whether admission of the testimony at issue constituted plain error, but not to the threshold question of whether admission of the testimony was error." Moore, __ N.C. at __, 726 S.E.2d at 173.

In Moore, a witness made brief, unsolicited comments concerning the Defendant's decision to exercise his right to remain silent. In determining that the challenged comments did not constitute plain error, the Supreme Court stated that:

In this case the admission of Officer Murphy's statements regarding defendant's post-Miranda exercise of his right to remain silent was not plain error. First, the prosecutor did not emphasize, capitalize on, or directly elicit Officer Murphy's prohibited responses. . . . [T]he prosecutor did not emphasize or highlight defendant's exercise of his rights. Moreover, the prosecutor did not mention defendant's exercise of his rights when he cross-examined defendant or in his closing argument. That the prosecutor did not emphasize, capitalize on, or directly elicit Officer Murphy's prohibited responses militates against a finding of plain error. . . . [G]iven the brief, passing nature of the evidence in the context of the entire trial, the evidence is not likely to have "tilted the scales" in the jury's determination of defendant's guilt or innocence.

Moore, __ N.C. at __, 726 S.E.2d at 173-74 (quoting Black, 308 N.C. at 741, 303 S.E.2d at 807) (other citations omitted). In addition, the Supreme

Court observed that, "on cross-examination[,] the State impeached defendant's testimony on a number of matters, including how often he had seen [the victim] prior to 2 February, the number and nature of his prior convictions carrying a sentence of more than sixty days imprisonment, and his consumption of alcohol on the day of the alleged incident" and noted that, "[o]n the record before this Court, the jury had reason to doubt defendant's credibility and to believe [the victim's] evidence." *Id.* Finally, the Supreme Court indicated that "[s]ubstantial evidence of a defendant's guilt is a factor to be considered in determining whether the error was a fundamental error rising to plain error" and pointed out in determining no plain error had occurred that "the evidence against defendant was substantial and corroborated by the witnesses." *Id.* at __, 726 S.E.2d at 174-75. As a result, our review of *Moore* suggests that the following factors, none of which should be deemed determinative, must be considered in ascertaining whether a prosecutorial comment concerning a defendant's post-arrest silence constitutes plain error: (1) whether the prosecutor directly elicited the improper testimony or explicitly made an improper comment; (2) whether the record contained substantial evidence of the defendant's guilt; (3) whether the defendant's credibility was successfully attacked in other ways in addition to the impermissible comment upon his or her decision to exercise his or her constitutional right to remain silent; and (4) the extent to which the prosecutor emphasized or capitalized on the improper testimony by, for example, engaging in extensive cross-examination concerning the defendant's post-arrest silence or attacking the defendant's credibility in closing argument based on his decision to refrain from making a statement to investigating officers.[5]

### B.  Application of General Legal Principles to the Facts

#### 1.  Cross-Examination of Defendant

##### a.  Pre-Arrest Silence

After briefly discussing certain frames contained in a surveillance video that had been introduced into evidence, the prosecutor attempted, with limited success, to impeach Defendant on the basis of his pre-arrest silence. More specifically, Defendant acknowledged on cross-examination that, after he had been admitted to the hospital, several

---

5. Although the remand order that led to the issuance of this opinion does not contain any explanation of the reasoning underlying the Supreme Court's decision to require us to conduct further proceedings in this case, we believe that the Court's remand decision probably rests on our failure to explicitly incorporate either the first or fourth of these criteria into the plain error analysis contained in our original opinion.

law enforcement officers came to see him. However, Defendant was in too much pain to converse with the officers at that time. In addition, the prosecutor asked Defendant whether Detective Redfern had attempted to interview him while he was in the hospital and whether Defendant had made certain statements to Detective Redfern. In response, Defendant denied any recollection of having conversed with Detective Redfern and testified that he did not "even know who [Detective] Redfern is." Finally, Defendant expressly denied having made particular statements to Detective Redfern.

"It is well settled. . . . that 'questions asked by an attorney are not evidence.'" *Kyle v. Holston Grp.*, 188 N.C. App. 686, 693 n.1, 656 S.E.2d 667, 672 n.1 (quoting *State v. Taylor*, 344 N.C. 31, 41, 473 S.E.2d 596, 602 (1996)), *disc. review denied*, 362 N.C. 359, 662 S.E.2d 905 (2008). Similarly, " 'a question in which counsel assumes or insinuates a fact not in evidence, and which receives a negative answer, is not evidence of any kind.' " *State v. Smith*, 289 N.C. 143, 157, 221 S.E.2d 247, 255 (1976) (quoting *State v. Anderson*, 283 N.C. 218, 226, 195 S.E.2d 561, 566 (1973)). As a result of the fact that Defendant denied any recollection of having had a discussion with Detective Redfern and the fact that the State chose not to offer any testimony from Detective Redfern, the record contains no evidence that Detective Redfern attempted to conduct a pre-arrest interview with Defendant or that Defendant declined to answer his questions. Thus, the record contains no indication that the State elicited evidence impeaching Defendant on the basis of his pre-arrest silence as allowed in *Boston*.

### b. Post-Arrest Silence

Subsequently, the prosecutor questioned Defendant about the fact that his trial testimony, which had been presented to the jury after the presentation of the State's case, constituted the first statement which Defendant had made since the shootings occurred:

Q. Now, you sat here through the entire trial and you heard all [of] the State's witnesses testify, right?

A. Yes.

Q. And you heard your own witness testify, didn't you?  ·

A. Yes.

. . . .

Q. Today, today is the very first time that you have given a statement in this case, isn't it?

A.  Yes.

Q.  And it has been since May the 20th, 2009, that you have had to think about it, isn't it?

A.  It has been ever since it happened.

Q.  Okay. That was May the 20th, 2009, wasn't it?

A.  Yes. No one else came to speak with me.

In addition, the prosecutor stressed the fact that, unlike Defendant, the other witnesses had given a statement to investigating officers immediately after the shootings. The clear import of the prosecutor's questions was that, because Defendant, unlike the other witnesses, chose not to make a statement about the shooting until trial, his account of the incident was inherently less credible than that of the other witnesses. As a result of the fact that Defendant was arrested on 20 May 2009, the prosecutor's questions about Defendant's silence "since May the 20th, 2009" clearly constituted an impermissible inquiry into Defendant's post-arrest silence.[6]

In addition, the prosecutor questioned Defendant extensively about the extent to which Detective Strother, whom the State did not call as a witness, had attempted to interview him and about Defendant's failure to make a statement to her.

Q.  Okay. What about Detective Strother, do you remember her coming in?

A.  Yes. . . . I remember her.

. . . .

Q.  Okay. And she went and spoke to you, didn't she?

A.  Yes, in the transporting car.

Q.  And before you were transported, she asked you for a statement about your role in this, didn't she?

A.  No.

Q.  Oh, she didn't ask you about that?

A.  She didn't ask me anything about a statement. The

---

6. For this reason alone, we are unable to accept the State's argument that the prosecutor's questioning of Defendant focused solely on his pre-arrest silence.

question came up about a waiver and she said that I
would have to sign a waiver to talk to her, to talk.

Q.   Okay. So, before she—before you were arrested she
     didn't ask you for a statement about your role?

A.   I don't recall it, no.

Q.   Okay. Well, before you were arrested she—you told
     her that you didn't want to give her a statement about
     your involvement, didn't you?

A.   I don't recall that, no.

Even so,[7] the prosecutor continued to question Defendant about his
interactions with Detective Strother:

Q.   Before you were arrested, she explained to you that
     there were two sides to every story and she wanted
     to hear what you had to say about the incident,
     didn't she?

     [DEFENSE]:  Objection. Objection to what a witness
who did not testify in this case said.

     COURT:  Well, sustained.

Q.   Do you recall her telling her, telling you that there
     were two sides to every story and . . .

     [DEFENSE]:  Objection.

Q.   . . . she wanted to hear from your side?

     [DEFENSE]:  Objection.

     COURT:  The objection is sustained.

Q.   Do you recall her telling you anything?

A.   Yes.

Q.   Okay. What did she tell you before you were arrested?

A.   I didn't know at what point I was arrested until I asked
     her, "Am I under arrest?", and that was at the point

---

7. The fact that Detective Strother insisted that Defendant waive his *Miranda* rights
before making a statement establishes that Defendant had, in fact, been advised of the
rights in question.

STATE v. RICHARDSON

[226 N.C. App. 292 (2013)]

when she was saying about the waiver, and I asked her what the waiver was for and she said that I would be waiving my right to talk to her. I asked her, "Am I under arrest?" and she said, "Yes." Then I said, "I need a lawyer."

Q. And she could ask you for your side of the story, didn't she?

A. Well, at that point - I mean I never heard her say that. I know at that point she turned her tape recorder on to record it.

Q. She was willing to record your statement to get your side of the story, wasn't she?

[DEFENSE]: Well, objection as to what she was willing to try to do.

COURT: Sustained.

Q. She tried to turn a tape recorder on to get your side of the story, didn't she?

[DEFENSE]: Objection.

Q. Didn't she?

[DEFENSE]: Whoa. Objection to that question again.

COURT: The objection is sustained.

Q. You testified that you saw her with a tape recorder, correct?

A. Yes.

Q. And at some point, did she ask you for your side of the story?

A. When she took out the tape recorder.

Q. At some point did she ask you for your side of the story? Yes or no.

A. Yes. And I said -

[PROSECUTOR]: Thank you, sir.

[DEFENSE]: May he finish his answer?

COURT: He may finish his answer.

A.  Yes, she did want my side of the story after she asked me to sign the waive[r]. She could not ask me until I signed the waiver before she could ask me.

Q.  And you didn't give her your side of the story, did you?

A.  She asked me . . .

Q.  Did you give her your side of the story? Yes or no.

A.  She asked me to sign a . . .

Q.  Sir, I am asking you a yes or no question - did you give her your side of the story - yes or no?

[DEFENSE]: Your Honor, I am going to ask that I be heard outside of the presence of the jury, if the Court thinks it is appropriate.

COURT: No. Just answer the question, Mr. Richardson.

A.  Well, I guess I was not able to give her my side of the story - no.

Q.  Thank you, sir. . . .

We are unable to understand these prosecutorial questions as anything other than an attempt to impeach Defendant by eliciting testimony that he had had an opportunity to make a post-arrest statement to Detective Strother in the event that he was willing to waive his *Miranda* rights and that Defendant failed to "tell his side of the story." As a result, this questioning, which comprised a significant part of the Prosecutor's cross-examination of Defendant and which elicited evidence that Defendant had failed to make a statement after refusing to waive his *Miranda* rights, was clearly impermissible under *Boston* as well.

### 2. Jury Argument

As a result of the fact that the available forensic evidence, including a blurry videotape, was less than conclusive, the jury's decision concerning the identity of the individual who had shot Mr. Kinard and Mr. Springs was likely to hinge upon the relative credibility of the parties' witnesses, including Defendant himself. For that reason, the State's closing argument centered on the prosecutor's contention that the State's witnesses were more credible than those offered by Defendant.

After reviewing the testimony of the State's witnesses, the prosecutor argued that Defendant "want[s] you to believe" that the State's witnesses were all lying despite the fact that they had no motive to do anything other than tell the truth. In addition, the prosecutor argued that the defense witnesses were not credible in that all of them were either intoxicated, had a criminal record, or were Defendant's friends. Next, the prosecutor argued that:

> You are the judges of the credibility of these witnesses and the things you use to judge whether somebody is being credible in their testimony is how they respond to the questions. [Defense Counsel] asked him, had he ever had a chance to tell his story, and he said no. Well, when I started asking him questions, what did he say? He had some chances and he didn't.

> Out of all of these witnesses, Sherman Cunningham, Bryan Herron, DC Springs, Marcus Kinard, Richard Snowden - all of them gave statements to the police. The only one who didn't, and he needed to give a statement, but the only one who didn't was that man right here, Roderick Richardson. Was he hurt and did he not give a statement because he was hurt? He was hurting but so was everybody else. So was Marcus Kinard, so was DC Springs, so was Richard Snowden - they were all shot and they all gave a statement.

As we have already noted, the only evidence which might conceivably support the prosecutor's argument that Defendant "had some chances" to "tell his story" was Defendant's testimony that Detective Strother offered to interview him after his arrest in the event that he agreed to waive his *Miranda* rights. Thus, the prosecutor's final argument to the jury impermissibly emphasized the fact that Defendant chose to remain silent after being placed under arrest and advised of his *Miranda* rights.

### C. Plain Error Analysis

After carefully reviewing the record, we conclude that, given the facts at issue here, the trial court's failure to take action to preclude the challenged questions and comments constituted plain error. The prosecutor's cross-examination of Defendant impermissibly focused almost exclusively on Defendant's failure, unlike other witnesses, to make a statement to investigating officers. Similarly, the comments made by the prosecutor during his concluding argument to the jury clearly

constituted an impermissible comment upon Defendant's decision to exercise his constitutional right to remain silent after being placed under arrest. In fact, the prosecutor's challenge to Defendant's credibility was limited to questions and comments concerning his failure, unlike the other witnesses, to "tell his side of the story" during the investigative process. Thus, the challenged questions and comments at issue here, unlike those before the Supreme Court in *Moore*, were not indirect or incidental.

As we have already noted, the only issue in serious dispute at trial was the identity of the individual who shot Mr. Springs and Mr. Kinard. In support of its contention that Defendant shot Mr. Springs and Mr. Kinard, the State offered the testimony of four eyewitnesses, each of whom testified that Defendant drew a weapon and fired at Mr. Kinard and Mr. Springs. On the other hand, Defendant testified that he did not possess a firearm at the time of the shootings and that he had not shot either Mr. Kinard or Mr. Springs. In addition, Defendant offered the testimony of three others present at the scene, none of whom saw Defendant employ a firearm. After carefully reviewing the evidentiary record, we conclude, as we did in our initial opinion in this case, that the State's evidence of Defendant's guilt, taken as a whole and without reference to the impermissible prosecutorial questions and comments, was substantial.

Although the State's witnesses all worked together, there was no evidence that they were any more than co-employees. In addition, while Mr. Kinard had consumed impairing substances and became involved in an altercation with Defendant immediately prior to the shooting, the other witnesses for the State were sober and had no history of antagonism towards or bias against Defendant. Finally, the record does not reflect that any of the State's witnesses had a prior criminal record. On the other hand, Defendant and Mr. Snowden were close friends, Defendant and Ms. Reed were romantically involved, both Defendant and Mr. Snowden had previous felony convictions, and all of the individuals who testified on behalf of Defendant acknowledged consuming alcohol for several hours before the shootings. In addition, although each of the individuals who testified on Defendant's behalf were present at the time of the shooting and had not seen a firearm in Defendant's possession, none of these individuals could identify the person or persons who shot Mr. Springs and Mr. Kinard. Finally, the surveillance video that was introduced into evidence at Defendant's trial, although containing images supportive of the positions espoused by both the State and Defendant, appears to corroborate the testimony of the State's witnesses in a number of respects. As a result, an analysis of the relative weight of the evidence proffered

by the parties, without taking into account the nature and extent of the State's impermissible harping upon Defendant's failure to make a statement, shows that the State's evidence was substantial.

As *Moore* establishes, however, our plain error analysis cannot end with an evaluation of the substantiality of the State's evidence. Instead, the Supreme Court's decision in *Moore* establishes that our plain error analysis must also focus on the nature, extent, and seriousness of the underlying error as well. Unlike the situation at issue in *Moore*, the prosecutor in this case did directly elicit, emphasize, and capitalize upon impermissible information in attacking Defendant's credibility. As a result, given that the relative credibility of the State's witnesses and those proffered by Defendant, including Defendant himself, was the critical issue before the jury at Defendant's trial; the fact that Defendant did elicit a significant amount of evidence, including his own denial of involvement in the assaults upon Mr. Kinard and Mr. Springs; the fact that the State did not elicit any evidence attacking Defendant's credibility (as compared to that of other witnesses) other than his post-arrest silence; and the fact that the prosecutor directly elicited and both emphasized and capitalized upon impermissible information concerning Defendant's decision to invoke his right to remain silent, we are unable, given the analytical framework set out in *Moore*, to reach any conclusion other than that the trial court's failure to preclude the challenged prosecutorial questions and comments rose to the level of plain error despite the fact that the State elicited substantial evidence, taken in isolation, of Defendant's guilt.[8]

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court committed plain error by allowing the State to cross-examine Defendant about his post-arrest silence and to comment on Defendant's failure to give a statement to investigating officers during his closing argument to the jury. As a result, Defendant is entitled to, and is hereby awarded, a new trial.

---

8. As we noted earlier, Defendant's trial counsel objected to several of the State's questions concerning Detective Strother's attempt to obtain Defendant's "side of the story." On one occasion, Defendant both objected to the prosecutor's question and asked to be heard. In response to this objection, the trial court directed Defendant to "answer the question." As a result, even though Defendant failed to properly preserve the issue before us in this case for appellate review, he did direct the trial court's attention to certain of the impermissible prosecutorial questions upon which we have based our decision.

NEW TRIAL.

Judges ROBERT C. HUNTER and STROUD concur.