IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-406

No. COA20-334

Filed 3 August 2021

Wilson County, No. 17 CRS 54110

STATE OF NORTH CAROLINA

v.

RAMON DAVAUL MALONE-BULLOCK

Appeal by defendant from judgment entered 16 August 2019 by Judge Leonard L. Wiggins in Wilson County Superior Court. Heard in the Court of Appeals 9 June 2021.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Patrick S. Wooten, for the State.*
>
> *Glover & Petersen, P.A., by James R. Glover, for defendant-appellant.*

ZACHARY, Judge.

Defendant Ramon Davaul Malone-Bullock appeals from a judgment entered upon a jury's verdict finding him guilty of first-degree murder. On appeal, Defendant argues that the trial court erred by overruling Defendant's objections to lay-witness opinion testimony. Defendant also argues that the trial court committed plain error by permitting the State to elicit testimony from a detective regarding Defendant's post-arrest silence. While we agree that the trial court erred by overruling Defendant's objections to impermissible lay-witness opinion testimony, we conclude

that the error did not prejudice Defendant. We further conclude that the trial court did not err by allowing the prosecutor to question the detective regarding Defendant's statements to law enforcement officers following his arrest. Therefore, after careful review, we conclude that Defendant received a trial free from prejudicial error.

## I. Background

¶ 2    The State's witnesses at Defendant's trial testified to the following: On the afternoon of 1 April 2017, Defendant attended a child's birthday party on Lincoln Street in Wilson, North Carolina, with his girlfriend, Jatoria Grice, and his friend, Devanta Battle. After the birthday party was over, some of the attendees went down the street to the home of Veronika Locus and began to play cards. A dispute over the card game arose between Defendant and Harry Beecher, and they got into a fistfight. Defendant told Mr. Beecher, "I'm going to kill you" and "you better not be here when I get back," and additionally threatened that "he was going to f*** him up[.]" Defendant then left with Ms. Grice in her car. Ms. Locus and Mr. Battle told Mr. Beecher to leave as well, but he did not.

¶ 3    When they left Ms. Locus's house, Defendant drove Ms. Grice's car; she testified that "[h]e drove really fast, like . . . 120" miles per hour, despite her request that he slow down. After Defendant ran a red light, Ms. Grice told him to stop the car. Defendant pulled over at a gas station, and Ms. Grice exited the car. Defendant drove off in the direction of his grandfather's house, where he was residing at the

time.

¶ 4        Shortly thereafter, Defendant returned to Ms. Locus's house. When Mr. Beecher saw Defendant, Mr. Beecher repeatedly said, "I'm going to get him now." As Mr. Beecher started to walk toward Defendant, Defendant shot him and then left. Mr. Battle, Alex Umstead, and Elliot Santiago witnessed the shooting. Mr. Beecher died at the scene.

¶ 5        Defendant's cousin, William Saxton, testified for the State at Defendant's trial. He testified that on the morning of 1 April 2017, he and Defendant used Mr. Saxton's gun to practice target shooting in the yard. Defendant asked if he could buy the gun from Mr. Saxton; Mr. Saxton refused, but allowed Defendant to borrow it. The gun had six bullets in the cartridge when Defendant took it. When Defendant returned the gun to Mr. Saxton the next day, 2 April 2017, the cartridge was empty.

¶ 6        Defendant's account at trial differed from that of the State's witnesses. In his opening statement, Defendant's counsel asserted that he "expect[ed] the evidence to be clear that William Saxton . . . pull[ed] the trigger on that gun that killed" Mr. Beecher. Defendant testified that, after letting Ms. Grice out of the car at the gas station, he drove to Mr. Saxton's home, which was near Defendant's residence. He told Mr. Saxton about the fight with Mr. Beecher, and Mr. Saxton "got real mad [that Mr. Beecher] put his hands on" Defendant. Mr. Saxton said, "I'm going to show you how to handle stuff." Defendant testified that Mr. Saxton dropped off Defendant at

the home of someone named "Old School" with whom Defendant gambled until Mr. Saxton returned. Defendant then asked Mr. Saxton what happened, and Mr. Saxton responded that "he handled that and don't ask him all these crazy questions." Defendant testified that he did not shoot Mr. Beecher, and that his "gut" told him that Mr. Saxton did.

¶ 7        Defendant was arrested on 15 December 2017 on the charge of first-degree murder for the death of Mr. Beecher. When detectives spoke with Defendant upon his arrest, Defendant told them that he did not shoot Mr. Beecher and he did not know who did.

¶ 8        Mr. Battle testified at trial to circumstances after the shooting. In February of 2018, defense counsel received discovery from the State. The discovery included the videotape of a December 2017 interview of Mr. Saxton, in which he told law enforcement officers that he had lent Defendant his gun from 1 to 2 April 2017. Mr. Battle testified that Defendant phoned him in May 2018, after Defendant became aware of the Saxton videotape:

> Basically [Defendant] mad like. . . . [S]o I asked him like, Elliot [Santiago] told me about Saxton. He like, yeah, blah, blah, blah, Saxton ain't right. . . . He was like how you going to tell on me; you the one that gave him the gun. . . . I ain't got nothing to prove but I know it's him; like I know it's him, got to be him. That's what he kept saying; got to be him, bro, I need you.

Mr. Battle then testified that Defendant told him, "You need to get rid of Saxton[,]"

which Mr. Battle understood to mean, "Kill him." Defendant and Mr. Battle then planned the killing of Mr. Saxton.

¶ 9    On 20 May 2018, Mr. Battle called Mr. Saxton and arranged a meeting. Mr. Battle picked up Mr. Saxton, with Mr. Battle's friend, Sabrina Presley, driving the car. Mr. Battle instructed her to turn onto a dead-end road and stop at a stop sign. When she did, Mr. Battle shot Mr. Saxton in the face. Mr. Saxton quickly exited the car and ran toward the woods; Mr. Battle jumped out after him and shot him again in the back. Mr. Saxton hid in the woods, and ultimately survived his injuries.

¶ 10    Afterward, Mr. Battle spoke to Defendant by phone again and told him, "boy got away, bro." Mr. Battle testified that Defendant sounded "disappointed" to hear this news.

¶ 11    On 16 July 2018, a Wilson County grand jury returned an indictment charging Defendant with first-degree murder in the death of Mr. Beecher. Following a trial, on 16 August 2019, the jury returned a verdict finding Defendant guilty of first-degree murder. The trial court entered judgment upon the verdict and sentenced Defendant to life imprisonment without the possibility of parole.

¶ 12    Defendant gave notice of appeal in open court.

## II.    Discussion

¶ 13    Defendant raises two arguments on appeal. First, Defendant argues that the trial court erred in denying his objections to two instances of improper lay-witness

opinion testimony. Second, he argues that the trial court committed plain error by permitting the State to elicit testimony from Detective Justin Godwin regarding Defendant's post-arrest silence. We address each argument in turn. After careful review, we conclude that the trial court did not commit prejudicial error by allowing the lay-witness opinion testimony, and that the trial court did not err by permitting the State to question Det. Godwin regarding Defendant's statement upon his arrest.

**A. Admission of Lay-Witness Opinion Testimony**

¶ 14      At trial, Mr. Battle testified, over Defendant's objection, that he believed that, after Defendant left Ms. Grice at the gas station, he was driving to Mr. Saxton's house because he knew that Mr. Saxton had guns. Defendant argues that the trial court erred by permitting Mr. Battle to testify to his opinion regarding where Defendant was driving or why.

¶ 15      In addition, Mr. Saxton testified, over Defendant's objection, that he believed that Defendant had set him up to be shot by Mr. Battle. Defendant argues that the trial court erred by permitting Mr. Saxton to speculate as to whether Defendant planned Mr. Saxton's shooting.

¶ 16      We agree that the trial court erred by admitting each of these lay-witness opinions; however, because the State presented ample other evidence upon which the jury could have relied in finding Defendant guilty of first-degree murder, we conclude that these errors were not prejudicial.

*1. Standard of Review*

Defendant objected to both Mr. Battle's and Mr. Saxton's testimony at trial; we therefore review the trial court's evidentiary rulings for abuse of discretion. *State v. Belk*, 201 N.C. App. 412, 417, 689 S.E.2d 439, 442 (2009), *disc. review denied*, 364 N.C. 129, 695 S.E.2d 761 (2010). "In determining whether a criminal defendant is prejudiced by the erroneous admission of evidence, the question is whether there is a reasonable possibility that, had the evidence not been admitted, the jury would have reached a different verdict." *State v. Shaw*, 106 N.C. App. 433, 441, 417 S.E.2d 262, 267, *disc. review denied*, 333 N.C. 170, 424 S.E.2d 914 (1992).

*2. Analysis*

Rule 701 of the North Carolina Rules of Evidence governs opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (2019).

Generally, "opinion evidence of a non-expert witness is inadmissible because it tends to invade the province of the jury." *State v. McKoy*, 2021-NCCOA-237, ¶ 14 (citation omitted). In that "the jury is charged with determining what inferences and

conclusions are warranted by the evidence[,]" *id.* (citation omitted), lay-witness opinion testimony is inadmissible when the jury is "as well qualified as the witness to draw the inferences and conclusions from the facts that [the witness] expresse[s] in his opinion[,]" *Belk*, 201 N.C. App. at 415, 689 S.E.2d at 441 (citation omitted).

¶ 20          Our Supreme Court has interpreted Rule 701 to allow a lay witness to testify to an opinion which is "a shorthand statement of fact, or, in other words, the instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time[.]" *State v. Roache*, 358 N.C. 243, 294, 595 S.E.2d 381, 414 (2004) (citations and internal quotation marks omitted). However, "[a]lthough a lay witness may be allowed to testify as to his opinion of the emotions a person displayed on a given occasion, a lay witness may not give his opinion of another person's intention on a particular occasion." *State v. Hurst*, 127 N.C. App. 54, 63, 487 S.E.2d 846, 853, *appeal dismissed and disc. review denied*, 347 N.C. 406, 494 S.E.2d 427 (1997), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998) (citation and internal quotation marks omitted).

¶ 21          Here, Mr. Battle testified on direct examination that he was with Ms. Locus at her house on the evening of 1 April 2017 when Ms. Locus received a telephone call from Ms. Grice, who said that Defendant was "driving fast" and "on the way to the country." Mr. Battle then testified as follows:

Q Do you know where [Defendant] lived at that time?

A Yes.

Q Where?

A In the country.

Q Where in the country?

A Out Packhouse.

Q Now did you know William Saxton?

A Yes.

Q Did you know where he lived?

A Yes.

Q Where did he live?

A Off Packhouse [Road].

Q Is that near [Defendant]?

A Yes. That's where I figured he was going.

Q Why is that? Why did you figure he was going there?

A Just the way she say he was driving and he was already mad so I figured he was going to see [Mr. Saxton].

Q Why would he do that?

[DEFENSE COUNSEL]: Objection. There's no foundation for his answer to this. He would be guessing, speculation.

THE COURT: If he knows why he can answer the question. Objection is overruled.

. . . .

BY [COUNSEL FOR THE STATE]:

Q Okay. Could you answer the question why he would be going there?

A [Mr. Saxton] got all the guns.

Defendant contends that Mr. Battle's testimony that he "figured" that Defendant was driving to Mr. Saxton's house because Mr. Saxton had "all the guns" amounts to an impermissible opinion. We agree.

Here, the jury was "as well qualified as [Mr. Battle] to draw the inferences and conclusions from the facts[.]" *Belk*, 201 N.C. App. at 415, 689 S.E.2d at 441. The State presented testimony that Defendant and Mr. Saxton lived near each other; that Defendant was driving at a high rate of speed in the direction of their respective houses; that Defendant appeared angry after the altercation with Mr. Beecher; that Mr. Saxton had a gun; and that Defendant knew that Mr. Saxton had a gun. The State presented these facts prior to eliciting the opinion statement from Mr. Battle. Therefore, the jury was well equipped to draw the same inference that Mr. Battle had drawn: that Defendant was driving to Mr. Saxton's house to acquire a gun. Accordingly, the trial court erred by admitting Mr. Battle's opinion testimony.

We similarly conclude that the trial court erred by overruling Defendant's objection to Mr. Saxton's opinion testimony and permitting Mr. Saxton to testify that he believed that Defendant planned for Mr. Battle to shoot him.

Mr. Saxton testified regarding his opinion as to Defendant's complicity in his

shooting:

> **Q** What was your thought when you were in the ambulance going to the hospital?
>
> **A** I was set up.
>
> **Q** By whom?
>
> [DEFENSE COUNSEL]: Objection.
>
> THE WITNESS: [Defendant].
>
> THE COURT: Overruled.
>
> BY [COUNSEL FOR THE STATE]:
>
> **Q** By whom?
>
> **A** [Defendant].
>
> **Q** Why?
>
> **A** About the shooting on Lincoln Street.

¶ 26     Mr. Saxton's testimony that he was "set up" by Defendant because of the shooting on Lincoln Street is an improper opinion. This testimony was not based on Mr. Saxton's perception, as is required by Rule 701, and he was in no better position than the jurors to deduce whether Defendant was responsible for Mr. Battle shooting him. *See State v. White*, 154 N.C. App. 598, 605, 572 S.E.2d 825, 831 (2002). "The jury is charged with drawing its own conclusions from the evidence, and without being influenced by the conclusion of [Mr. Saxton]. Therefore, we find the trial court erred in permitting this testimony." *Id.*

¶ 27    Nevertheless, we conclude that neither statement prejudiced Defendant. "In determining whether a criminal defendant is prejudiced by the erroneous admission of evidence, the question is whether there is a reasonable possibility that, had the evidence not been admitted, the jury would have reached a different verdict." *Shaw*, 106 N.C. App. at 441, 417 S.E.2d at 267. Defendant cannot show that the admission of Mr. Battle's or Mr. Saxton's opinion testimony prejudiced him. Three eyewitnesses testified that Defendant shot Mr. Beecher. The jury also heard testimony that Defendant threatened to kill Mr. Beecher, that he told Mr. Beecher that he had "better not be here" when Defendant returned, and that he borrowed Mr. Saxton's gun on the day of the shooting and returned it with an empty cartridge the following day. Additionally, Defendant himself testified—following the erroneous admission of the above testimony—that, after he left Ms. Grice at the gas station, he drove to Mr. Saxton's house. Therefore, Defendant cannot show "a reasonable possibility that, had the evidence not been admitted, the jury would have reached a different verdict." *Id.*

**B. Post-Arrest Silence**

¶ 28    Defendant next argues that the trial court committed plain error by permitting the prosecutor to elicit testimony from Det. Godwin that Defendant did not offer his version of the events—strongly implying that Mr. Saxton shot and killed Mr. Beecher—at any time between his arrest and trial. Defendant contends that the prosecutor's questioning impermissibly referenced his right not to incriminate

himself under the Fifth Amendment to the United States Constitution. After careful review, we conclude that the trial court did not err in permitting this line of questioning because it did not, in fact, refer to any post-arrest silence on the part of Defendant.

*1. Preservation*

As a preliminary matter, the State, pointing to *State v. Gardner*, 68 N.C. App. 515, 316 S.E.2d 131 (1984), *aff'd*, 315 N.C. 444, 340 S.E.2d 701 (1986), argues that this issue is not appropriate for appellate review because it is an unpreserved constitutional issue. In *Gardner*, the defendant argued on appeal that cross-examination regarding his "failure to give a statement to the police after his arrest violated his constitutional right to remain silent." 68 N.C. App. at 518, 316 S.E.2d at 133. However, this Court concluded that, because the defendant neither asserted plain error on appeal nor raised a constitutional objection at trial, he waived appellate review of the alleged violation. *Id.* at 520, 316 S.E.2d at 133.

*Gardner* is not applicable in the instant case, in which Defendant has clearly asserted plain error; instead, our Supreme Court's decision in *State v. Moore*, 366 N.C. 100, 726 S.E.2d 168 (2012), governs where a defendant asserts that the trial court committed plain error in admitting testimony in violation of his constitutional right not to incriminate himself. In *Moore*, the defendant argued that the trial court committed plain error by admitting the testimony of a law enforcement officer that

referred to the defendant's exercise of his Fifth Amendment right not to incriminate himself. 366 N.C. at 103, 726 S.E.2d at 171. The Court of Appeals concluded that the admission was error, but that it did not amount to plain error. *Id.* at 103–04, 726 S.E.2d at 171–72. The Supreme Court of North Carolina affirmed, concluding that the trial court erred in admitting the testimony that referred to the defendant's post-arrest silence, but that "the brief, passing nature" of the erroneously admitted evidence did not amount to plain error. *Id.* at 107, 726 S.E.2d at 174. In deciding that the admission of the officer's testimony was error but not plain error, the *Moore* Court noted that "[t]he prosecutor did not emphasize, capitalize on, or directly elicit [the officer's] prohibited responses; the prosecutor did not cross-examine [the] defendant about his silence; the jury heard the testimony of all witnesses, including [the] defendant; and the evidence against [the] defendant was substantial and corroborated by the witnesses." *Id.* at 109, 726 S.E.2d at 175.

¶ 31        Therefore, pursuant to our Supreme Court's analysis in *Moore*, the issue of whether the trial court committed plain error by admitting testimony regarding Defendant's post-arrest silence is properly before us.

### 2. *Standard of Review*

¶ 32        "For error to constitute plain error, a defendant must demonstrate that . . . . after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence,* 365 N.C. 506, 518, 723

S.E.2d 326, 334 (2012) (citation and internal quotation marks omitted). Regarding

the burden on criminal defendants under plain-error review, our Supreme Court has

explained that

> [t]he plain error rule is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to [the] appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.

*Id.* at 516–17, 723 S.E.2d at 333 (emphasis, citation, and internal quotation marks

omitted).

### 3. *Analysis*

Defendant contends on appeal that the trial court committed plain error by

permitting the prosecutor to question Det. Godwin regarding Defendant's failure to

mention his belief that Mr. Saxton shot Mr. Beecher, maintaining that the

"prosecutor's deliberate elicitation of evidence that [Defendant] remained silent and

did not tell the State's investigators about Saxton's involvement in the shooting . . .

was a clear violation of [Defendant]'s state and federal constitutional rights[.]"

Defense counsel first articulated Defendant's theory of the case—that Mr.

Saxton shot Mr. Beecher—during his opening statement. The prosecutor later questioned Det. Godwin on direct examination regarding whether Defendant mentioned his account of the events of 1 April 2017 during Defendant's post-arrest interview:

> Q Okay. And did you have an opportunity to talk to [Defendant] after he was charged with first degree murder?
>
> A I did.
>
> Q After . . . Defendant was charged with first degree murder, did he tell you the story that [defense counsel] said in his opening?
>
> A No. That's the first time I've heard that was during the opening. He never said anything about that.
>
> Q So [Defendant] didn't tell you, even after he was charged, that William Saxton took the car and the gun over to Lincoln Street.
>
> A No, he did not.
>
> Q Did [Defendant], when he was charged, after he was charged, in that interview, did he tell you anything about anybody else going back over to Lincoln Street and shooting Harry Beecher?
>
> A No.
>
> Q Was he able to explain to you why he smelled like gasoline?
>
> A I believe he may have mentioned [he] may have spilled some gas. He was -- was not real -- he didn't want to talk about that when I mentioned that to him, even during the interview, the second interview.

> **Q** Even after the last interview in December of 2017, after the Defendant was charged, did he ever say anything about seeing or being in William Saxton's presence at any time after dark on April 1st, 2017 until the sun came up on April 2nd, Sunday, 2017?
>
> **A** No.

Defendant contends that this line of questioning violated his constitutional right not to incriminate himself because it impermissibly referenced his post-arrest silence for the purposes of impeaching his credibility. We disagree.

"A criminal defendant's right to remain silent is guaranteed under the Fifth Amendment to the United States Constitution and is made applicable to the states by the Fourteenth Amendment." *Moore*, 366 N.C. at 104, 726 S.E.2d at 172. "We have consistently held that the State may not introduce evidence that a defendant exercised his Fifth Amendment right to remain silent." *Id.* (citation omitted). As our Supreme Court has explained, "[t]he rationale underlying this rule is that the value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." *Id.* (citation and internal quotation marks omitted).

However, where a criminal defendant does not in fact remain silent but makes "spontaneous utterances" to law enforcement officers, "in-court questioning of the officers on the <u>extent</u> of [a] defendant's statements" does not violate the right against compelled self-incrimination. *State v. Alkano*, 119 N.C. App. 256, 260, 458 S.E.2d 258, 261, *appeal dismissed*, 341 N.C. 653, 465 S.E.2d 533 (1995). Indeed, "[s]ilence at the

time of arrest is the critical element of the Fifth Amendment right . . . . The [United

States] Supreme Court has described that right as the right to remain silent unless

[the defendant] chooses to speak in the unfettered exercise of his own will." *Id.* at 261,

458 S.E.2d at 262 (emphasis, citation, and internal quotation marks omitted). And

where a criminal defendant does not exercise the right to remain silent but instead

speaks to law enforcement officers "regarding the facts of the incident at the time of

his arrest[,]" the rule prohibiting a reference to a defendant's exercise of the right to

remain silent "can have no application[.]" *Id.* (citation omitted).

¶ 38          For example, in *State v. Richardson*, the prosecutor improperly cross-examined

the defendant regarding the exercise of his right to remain silent by declining to give

a statement to police:

> Q. Now, you sat here through the entire trial and you heard
> all of the State's witnesses testify, right?
>
> A. Yes.
>
> Q. And you heard your own witness testify, didn't you?
>
> A. Yes.
>
> Q. Today, today is the very first time that you have given a
> statement in this case, isn't it?
>
> A. Yes.

226 N.C. App. 292, 303–04, 741 S.E.2d 434, 442–43 (2013).

¶ 39          Further, "the prosecutor questioned [the d]efendant extensively about the

extent to which [the detective], whom the State did not call as a witness, had attempted to interview him and about [the d]efendant's failure to make a statement to her." *Id.* at 304, 741 S.E.2d at 443. This Court, applying *Moore*, concluded that the trial court erred in allowing this line of questioning, which constituted

> an attempt to impeach [the d]efendant by eliciting testimony that he had had an opportunity to make a post-arrest statement to [the detective] in the event that he was willing to waive his *Miranda* rights and that [the d]efendant failed to "tell his side of the story." As a result, this questioning, which comprised a significant part of the [p]rosecutor's cross-examination of [the d]efendant and which elicited evidence that [the d]efendant had failed to make a statement after refusing to waive his *Miranda* rights, was clearly impermissible[.]

*Id.* at 307, 741 S.E.2d at 444.

¶ 40    In *Alkano*, however, the defendant "was not silent regarding the facts of the incident at the time of his arrest." 119 N.C. App. at 261, 458 S.E.2d at 262. Because the defendant did not actually exercise his right to remain silent, we concluded that "[t]he prosecutor's questions to the officers concerning [the] defendant's lack of explanation did not violate [the] defendant's rights against self-incrimination under either the United States or North Carolina Constitutions." *Id.* at 262, 458 S.E.2d at 262.

¶ 41    The case at hand bears more similarity to *Alkano* than to *Richardson*. Here, Defendant did not actually remain silent; he spoke with Det. Godwin when he was

arrested, telling Det. Godwin that he did not shoot Mr. Beecher and that he did not know who did. Defendant himself testified to making this statement to Det. Godwin. The prosecutor's questions to Det. Godwin regarding the differences between Defendant's voluntary statement—that he did not kill Mr. Beecher and he did not know who did—and his explanation at trial—that he suspected that Mr. Saxton killed Mr. Beecher—do not amount to an impermissible comment on Defendant's post-arrest silence because Defendant was not silent. Thus, "[t]he prosecutor's questions to [Det. Godwin] concerning [D]efendant's lack of explanation did not violate [D]efendant's rights against self-incrimination under either the United States or North Carolina Constitutions." *Id.*

## III.    Conclusion

¶ 42        Accordingly, we conclude that although the trial court erred by overruling Defendant's objections to certain impermissible lay-witness opinion testimony, the error did not amount to prejudicial error. We further conclude that the trial court did not err by permitting the prosecutor to question a law enforcement officer regarding the difference between Defendant's statement upon his arrest and his theory of defense at trial. Thus, Defendant received a trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges DILLON and HAMPSON concur.