An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-917

Filed: 5 May 2015

Guilford County, No. 13 CRS 81488

STATE OF NORTH CAROLINA

v.

CLARENCE CLIFTON ROBINSON

Appeal by Defendant from judgment entered 3 April 2014 by Judge Edgar B. Gregory in Guilford County Superior Court. Heard in the Court of Appeals 18 February 2015.

> *Attorney General Roy Cooper, by Assistant Attorney General Bethany A. Burgon, for the State.*
>
> *Kimberly P. Hoppin for Defendant.*

STEPHENS, Judge.

Defendant Clarence Clifton Robinson was convicted in Guilford County Superior Court on one count of assault with a deadly weapon with intent to kill inflicting serious injury. Robinson appeals from the trial court's denial of his motion to dismiss the charge against him for insufficient evidence and its failure to instruct the jury on the lesser included offense of assault inflicting serious injury. Robinson also argues that the trial court committed plain error by allowing the State to

impermissibly comment during cross-examination and closing arguments on the exercise of his right to remain silent. After careful consideration, we hold that the trial court did not commit any prejudicial error.

## I. Facts and Procedural History

On the afternoon of 9 June 2013, Officer Timothy D. Brown of the Greensboro Police Department ("GPD") responded to a reported stabbing at a residence located at 110 Shaw Street. When he arrived at the scene, Officer Brown found EnRico Pelcher seated on the front steps and bleeding from his face and chest. Officer Brown asked Pelcher to lie down so his wounds could be assessed, then called for back-up. Although Pelcher was in such extreme pain that he had difficulty speaking clearly, he told Officer Brown that a man called "C-Note" had stabbed him "over a gun." Officer Brown found a pocketknife with a brass knuckle handle on the porch, but did not recover any guns from the scene or find any evidence that one had been fired there recently. Pelcher, who suffered stab wounds to his face, chest, back, rib cage, and ear, lost consciousness shortly thereafter and was taken to Moses Cone Hospital for emergency surgery to repair cuts to several blood vessels and a collapsed lung and kidney. He was released one week later after spending three and a half days in a coma and accruing over $130,000.00 in medical bills.

During a subsequent interview with GPD investigators, Brenda Davis, a resident of 110 Shaw Street, identified "C-Note" as her daughter's ex-boyfriend,

Clarence Clifton Robinson. After visits to Robinson's previous local addresses turned up nothing, Detective John Matthews of GPD's Violent Criminal Apprehension Team received information that Robinson had fled to his mother's house in the Bronx, New York. Detective Matthews used a police database to find Robinson's mother's address and then contacted New York authorities to check it. On 16 July 2013, Robinson was arrested and brought back to North Carolina.

On 19 August 2013, Robinson was indicted by a Guilford County grand jury on one count of assault with a deadly weapon with intent to kill inflicting serious injury and one count of assault with a deadly weapon with a minor present. A jury trial began on 31 March 2014 in Guilford County Superior Court. Pelcher and Robinson were the only two witnesses present during the stabbing who testified.

Pelcher testified that on 9 June 2013, he had been dating Robinson's ex-girlfriend Ashley Davis for about four years. Davis lived with her mother Brenda at 110 Shaw Street. Pelcher explained that he had first met Robinson in 2001 or 2002 while he was dating Robinson's sister, Niki, and that prior to the stabbing, he and Ashley had last seen Robinson earlier that morning at roughly six o'clock after a party at a mutual acquaintance's house. Pelcher testified that he and Robinson had exchanged words that morning about how Pelcher had treated both Niki and Ashley, but that their conversation had not involved any "yelling or really kind of going—going at each other's throats or anything." Pelcher testified further that he and

Ashley had gone to her mother's house at around two o'clock that afternoon, then Ashley spoke to someone on the phone and suggested they go get some food. When they returned, they found a man called "Tech," who Pelcher believed was Robinson's brother, sitting inside the residence on a couch. Robinson then walked in the door and accused Pelcher of having stolen his gun. Pelcher denied having Robinson's gun and lifted his shirt to show that he was not carrying any weapons. Ashley and her mother told the two men to take their argument outside. Pelcher testified that they did, and were accompanied by Tech, Ashley, and her minor daughter. Once outside, Pelcher continued to tell Robinson that he did not have his gun, but Robinson did not believe him and declared that he would not leave without it. Tech urged the two men to fight but Pelcher said he did not want to because he did not know whether Robinson had any weapons. Instead, Pelcher attempted to go back inside the house but someone inside had closed the door and would not open it. At that point, according to Pelcher, Robinson reached into his front pocket, pulled out the pocketknife with the brass knuckle handle, and came at him.

Pelcher testified that during the struggle that ensued, he did not immediately realize that he had been stabbed, but that he eventually wrestled the knife out of Robinson's hand, at which point Robinson apologized and then fled the scene with Tech. After unsuccessfully attempting to leave the scene in his own car, Pelcher collapsed to the ground covered in blood and screamed for help but there was no one

in sight. Eventually, Ashley came around the corner, asked if he was OK, borrowed the phone out of his pocket to call for help, then left the scene before police or ambulances could arrive because she had a warrant out for her arrest. On cross-examination, Pelcher acknowledged minor inconsistencies between his testimony and his prior statements to GPD investigators but ultimately did not waver in his insistence that he was neither armed nor the aggressor during the stabbing.

Robinson's testimony presented a dramatically different version of the incident. Robinson testified that he had been regularly buying cocaine from Pelcher for some time. On 9 June 2013, he went to 110 Shaw Street on to buy more cocaine from Pelcher when an argument broke out. Robinson testified that he made it known that he was unhappy with the quality of cocaine Pelcher had sold him several days earlier, that Pelcher responded by accusing him of sleeping with Ashley, and that eventually the two men were told to take their argument outside. They left the house and the argument escalated on the front porch, where Pelcher kicked Robinson, then Robinson charged Pelcher, at which point Pelcher pulled out a gun and pointed it at Robinson. Robinson testified that he grabbed Pelcher's gun with his left hand, pulled out his brass knuckle-handled pocketknife with his right hand, opened it, and then stabbed Pelcher in self-defense. Robinson testified further that Pelcher eventually dropped the gun but then grabbed for the knife and began to cut him as the two men continued to tussle. According to Robinson, at some point, Ashley picked up the gun

and fled around the corner, then Robinson let go of the knife and left the scene as well. Robinson testified that he did not seek any medical treatment for the injuries he claimed to have suffered while he and Pelcher struggled over the knife, and that he subsequently went to New York because he received phone calls from Pelcher's associates threatening his safety. On cross-examination, the State repeatedly asked Robinson why, if he had been acting in self-defense, had he not called the police after Pelcher pulled a gun on him; Robinson replied that he had feared the police would blame him and put him in jail. When asked whether he had told anyone else before trial that he had acted in self-defense, Robinson answered that he had not told anyone apart from his mother and his attorney because "the only person I'm supposed to talk to is my attorney." The State revisited this theme in its closing argument to the jury, noting that "it would have been nice if I had had a person such as [Robinson's] mother or any other person who since June the [ninth] of last summer he had told this story to besides you jurors today. There is no other person. He has not told any other person."

At the close of the State's evidence, Robinson moved to dismiss both the charges against him for insufficient evidence. The trial court denied the motion with regard to the charge of assault with a deadly weapon with intent to kill inflicting serious injury, but dismissed the charge of assault with a deadly weapon with a minor present because the State could not satisfy the required element of showing a

personal relationship between the defendant and the victim. At the close of all the evidence, Robinson renewed his motion to dismiss the remaining charge, but the trial court denied it, reasoning "there's been substantial evidence of each element of the offense as well as substantial evidence that the defendant was the perpetrator such as to cause the court to overrule the motion and allow the case to be ruled upon by the jury." During the Rule 21 jury instructions conference that followed, the trial court granted Robinson's request for a self-defense instruction. Robinson also requested that the trial court instruct the jury on the lesser included offenses of assault with a deadly weapon, assault inflicting serious injury, and simple assault. The trial court declined to offer an instruction on assault inflicting serious injury but included instructions on the other two lesser included offenses and noted Robinson's objection for the record. The jury ultimately returned a verdict finding Robinson guilty of assault with a deadly weapon with intent to kill inflicting serious injury. The trial court entered judgment on 3 April 2014 and sentenced Robinson to a term of 96 to 128 months imprisonment. Robinson gave notice of appeal in open court.

## II. Analysis

### A. Motion to dismiss for insufficient evidence of intent to kill

Robinson argues that the trial court erred in denying his motion to dismiss the charge of assault with a deadly weapon with intent to kill inflicting serious injury

because the State failed to present sufficient evidence of his intent to kill. We disagree.

In reviewing a trial court's denial of a motion to dismiss, this Court applies a *de novo* standard of review. *See State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). A defendant's motion to dismiss should be denied if "there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Stone*, 323 N.C. 447, 451, 373 S.E.2d 430, 433 (1988) (citation omitted). When ruling on a motion to dismiss, the trial court must view the evidence "in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State." *State v. Kemmerlin*, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002) (citation omitted). "Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve." *State v. Fritsch*, 351 N.C. 373, 379, 526 S.E.2d 451, 455 (citation omitted), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). "The evidence need only give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury for a determination of [the] defendant's guilt beyond a reasonable doubt." *Stone*, 323 N.C. at 452, 373 S.E.2d at 433 (citation omitted). However, a motion to dismiss should be allowed where the

evidence does no more than raise a suspicion or conjecture as to the defendant's guilt. *Id.*

As defined by our General Statutes, the elements of the offense of assault with a deadly weapon with intent to kill inflicting serious injury are: "(1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, (5) not resulting in death." *State v. Wampler*, 145 N.C. App. 127, 130, 549 S.E.2d 563, 567 (2001) (citation omitted); *see also* N. C. Gen. Stat. § 14-32(a) (2013). As this Court has previously recognized, "[p]roof of an assault with a deadly weapon inflicting serious injury not resulting in death does not, as a matter of law, establish a presumption of intent to kill. Such intent must be found by the jury as a fact from the evidence." *Id.* (citation omitted). However, "an intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances." *Id.* (citation omitted).

In the present case, Robinson contends that although the evidence presented at trial may have been sufficient to prove assault with a deadly weapon inflicting serious injury, it did not establish his intent to kill Pelcher. This argument fails, however, in light of the undisputed evidence in the record, including Robinson's own testimony under direct and cross-examination, that Robinson was armed with brass knuckles but instead stabbed Pelcher multiple times in the chest and face with a pocketknife attached to the knuckles and then left the scene without any attempt to

call for help while Pelcher bled profusely from his wounds. Taking all the evidence in the light most favorable to the State, we therefore conclude that the State presented sufficient evidence from which the jury could reasonably infer that Robinson did indeed act with the requisite intent to kill Pelcher. Accordingly, we hold that the trial court did not err in denying Robinson's motion to dismiss.

### *B. Jury instructions for lesser included offense*

Robinson contends that the trial court erred by declining to instruct the jury on the lesser included offense of assault inflicting serious injury. We disagree.

We note at the outset that there is some confusion between the parties over whether this issue has been properly preserved for our review. The State argues that because Robinson failed to object at trial after the instructions were read to the jury, he has failed to satisfy the requirements of N.C.R. App. P. 10(b)(2), and thus our review must be limited to whether the trial court committed plain error by rejecting Robinson's proposed jury instruction on assault inflicting serious injury. However, as this Court has previously explained, the purpose of Rule 10(b)(2) "is to bring errors in jury instructions to the trial court's attention in order to prevent unnecessary new trials." *State v. West*, 146 N.C. App. 741, 743, 554 S.E.2d 837, 839 (2001) (citation omitted). "This policy is met when a request to alter an instruction has been submitted and the trial judge has considered and refused the request." *Id.* (citation and brackets omitted). In the present case, Robinson requested an instruction on

assault inflicting serious injury during the Rule 21 jury instructions conference; the trial court denied this request, but expressly noted Robinson's objection for the record. Thus, as in *West,* we conclude here that Robinson's "tender of proposed jury instructions and the trial court's refusal to submit these to the jury sufficed to preserve the issue for appeal, and our review is not restricted to plain error." *Id.*

As a general matter,

> [w]hen considering whether to submit to the jury a lesser included offense, the trial court must determine whether (1) the lesser offense is, as a matter of law, an included offense for the crime for which the defendant is indicted and (2) there is evidence in the case which will support a conviction of the lesser included offense.

*Smith,* 186 N.C. App. at 65, 650 S.E.2d at 35 (citation and internal quotation marks omitted). The failure to instruct the jury on a lesser included offense when the evidence supports such an instruction "constitutes reversible error that cannot be cured by a verdict finding the defendant guilty of the greater offense." *State v. Liggons,* 194 N.C. App. 734, 742, 670 S.E.2d 333, 339 (2009) (citation omitted). However, our Supreme Court has long recognized that "when all the evidence tends to show that [the] defendant committed the crime charged in the bill of indictment and there is no evidence of the lesser[]included offense, the court should refuse to charge on the lesser[]included offense." *State v. Summitt,* 301 N.C. 591, 596, 273 S.E.2d 425, 427 (citation omitted), *cert. denied,* 451 U.S. 970, 68 L. Ed. 2d 349 (1981). This Court's prior decisions make clear that assault inflicting serious injury is a lesser

included offense of assault with a deadly weapon with intent to kill inflicting serious injury, *see, e.g.*, *State v. Lowe*, 150 N.C. App. 682, 685, 564 S.E.2d 313, 315 (2002), and that its essential elements are "(1) an assault (2) inflicting serious injury." *Liggons,* 194 N.C. App. at 742, 670 S.E.2d at 339 (citation omitted); *see also* N.C. Gen. Stat. § 14-33(c)(1) (2013).

In the present case, Robinson complains that the trial court erred by declining to instruct the jury on assault inflicting serious injury because it did not instruct the jury that the brass knuckle-handled pocketknife that Robinson admitted to stabbing Pelcher with was a deadly weapon as a matter of law. By Robinson's logic, the fact that the trial court did include a jury instruction on simple assault demonstrates that the issue of whether or not the knife was a deadly weapon was a matter for the jury's determination and also implies that the evidence was sufficient to support a finding by the jury that Pelcher was intentionally cut or stabbed with a weapon that was not deadly. In support of this argument, Robinson cites our Supreme Court's decision in *State v. Palmer*, 293 N.C. 633, 239 S.E.2d 406 (1977), which recognized that,

> [w]here the allegedly deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question as to whether or not it is deadly within the foregoing definition is one of law, and the [trial c]ourt must take the responsibility of so declaring. . . . But where it may or may not be likely to produce fatal results, according to the manner of its use, or the part of the body at which the blow is aimed, its allegedly deadly character is one of fact to be determined by the jury.

*Id.* at 643, 239 S.E.2d at 413 (citation omitted). As such, Robinson argues that the trial court's failure to instruct on the lesser included offense of assault inflicting serious injury deprived the jury of the only option by which it could have concluded that although Pelcher's injuries were serious, Robinson acted without a deadly weapon.

There are several reasons why this argument fails. First, although our State's appellate courts have long acknowledged that "the evidence in each case determines whether a certain kind of knife is properly characterized as a lethal device as a matter of law or whether its nature and manner of use merely raises a factual issue about its potential for producing death," *see, e.g.*, *State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E.2d 719, 726 (1981) (citations omitted), our prior decisions have also made clear that "[t]he definition of a deadly weapon clearly encompasses a wide variety of knives. For instance, a hunting knife, a kitchen knife, and a steak knife have been denominated deadly weapons *per se*. . . . A pocketknife is also unquestionably capable of causing serious bodily injury or death." *Id.* at 301, 283 S.E.2d at 725-26; *see also* *State v. Collins*, 30 N.C. 407, 409, 412 (1848) (opining that a pocketknife with a two and a half-inch blade was a deadly weapon as a matter of law); *State v. Cox*, 11 N.C. App. 377, 380, 181 S.E.2d 205, 207 (1971) (holding that a knife with a three-inch blade constitutes a deadly weapon *per se* when used as a weapon in an assault). Moreover, "well-established principles of North Carolina law allow the extent to

which a particular instrument is a deadly weapon to be inferred based on the effects resulting from the use made of that instrument." *State v. Walker*, 204 N.C. App. 431, 446, 694 S.E.2d 484, 494 (2010) (holding that a small knife was a deadly weapon where the defendant used it to wound the victim's lip, arm, and back and cause a puncture wound to the victim's lung, resulting in substantial bleeding and inflicting injuries requiring significant medical treatment); *see also State v. Graham*, 186 N.C. App. 182, 195, 650 S.E.2d 639, 648 (2007) (holding that the serious nature and extent of the victim's injuries were sufficient for the trial court to instruct the jury that a knife was a deadly weapon as a matter of law where one was used to stab a victim nine times resulting in a collapsed lung and other life-threatening injuries requiring surgery), *appeal dismissed and disc. review denied*, __ N.C. __, 666 S.E.2d 765 (2008); *State v. Smallwood*, 78 N.C. App. 365, 369, 337 S.E.2d 143, 145 (1985) ("Where the victim has in fact suffered serious bodily injury or death, the courts have consistently held that a knife is a dangerous or deadly weapon *per se* absent production or detailed description.").

When considered collectively, the prior cases from this Court and our Supreme Court make clear that when a knife is used in an assault as a knife or in any other way "likely to produce death or great bodily harm," it is proper to instruct the jury that it is a deadly weapon as a matter of law. *See, e.g., State v. Torain*, 316 N.C. 111, 121, 340 S.E.2d 465, 471 (citation omitted), *cert. denied*, 479 U.S. 836, 93 L. Ed. 2d

- 14 -

77 (1986). In fact, as our Supreme Court noted in *Torain*, where a knife "is of such character as to admit of but one conclusion," the trial court commits harmless error by leaving the question of its deadly character for the jury's determination. *Id.* at 119, 340 S.E.2d at 470. Indeed, in *State v. McKinnon*, 54 N.C. App. 475, 283 S.E.2d 555 (1981), this Court rejected a defendant's argument that his conviction for assault with a deadly weapon resulting in serious bodily injury should be vacated because the trial court had submitted the question of whether the knife he used on the victim was a deadly weapon to the jury and therefore, according to the defendant, should have also been required to instruct the jury on the lesser included offense of assault inflicting serious injury. *Id.* at 476-77, 283 S.E.2d at 557. Instead, we reasoned that because the uncontradicted evidence in the record demonstrated that the defendant's assault caused the victim's lung to collapse, the circumstances of the knife's use "admit of but one conclusion," thus making its deadly character a question of law for the trial court's determination. *Id.* at 477, 283 S.E.2d at 557. We therefore held that "the trial court should have held that the pocketknife as used by [the] defendant was a deadly weapon as a matter of law. There was, therefore, no error in the court's failure to submit the lesser offense of [assault inflicting serious injury]." *Id.* at 478, 283 S.E.2d at 557.

Here, we are confronted with virtually the same issue as in *McKinnon*, and we reach a similar conclusion. The uncontradicted evidence in the record demonstrates

that Robinson used his brass knuckle-handled pocketknife to stab Pelcher five times, resulting in wounds to his face, chest, back, rib cage, and ear, cuts to several blood vessels, and a collapsed lung and kidney, which required emergency surgery and left Pelcher hospitalized for one week, half of which he spent in a coma. Clearly then, Robinson used his knife in a way that was "likely to produce death or great bodily harm." *See Torain*, 316 N.C. at 121, 340 S.E.2d at 471. We consequently have no trouble concluding that the trial court should have instructed the jury that the knife was a deadly weapon as a matter of law. We further conclude that, as recognized in *Torain*, the trial court's failure to properly instruct the jury on this issue constituted harmless error. *See id.* at 119, 340 S.E.2d at 470 ("[A]llowing [the] jury to decide nature of instrumentality is error in some cases, but the higher burden of proof . . . is advantageous to [the] defendant and is therefore harmless error."). Moreover, Robinson cites no evidence whatsoever from which a reasonable juror could rationally conclude that the brass knuckle-handled pocketknife was used in any way other than as a deadly weapon, and our review of the record reveals none either. We therefore conclude, as in *McKinnon*, that the evidence here does not support a jury instruction on the lesser included offense of assault inflicting serious injury. Accordingly, we hold that the trial court did not err in declining to instruct the jury on this charge.

## C. Right to remain silent

Finally, Robinson argues that the trial court committed plain error by allowing the State to comment without objection during cross-examination and in its closing argument on Robinson's decision to exercise his right to remain silent. We disagree.

"A criminal defendant's right to remain silent is guaranteed under the Fifth Amendment to the United States Constitution and is made applicable to the States by the Fourteenth Amendment." *State v. Richardson*, __ N.C. App. __, __, 741 S.E.2d 434, 440 (2013). North Carolina's appellate courts "have consistently held that the State may not introduce evidence that a defendant exercised his [F]ifth [A]mendment right to remain silent." *State v. Moore*, 366 N.C. 100, 104, 726 S.E.2d 168, 172 (2012) (citations and internal quotation marks omitted). "If a defendant has been given his *Miranda* warnings, his silence may not be used against him." *Id.* (citations and internal quotation marks omitted). "The rationale underlying this rule is that the value of constitutional privileges is largely destroyed if persons can be penalized for relying on them." *Id.* (citation, internal quotation marks, and brackets omitted). As a result, the extent to which "the State may use a defendant's silence at trial depends on the circumstances of the defendant's silence and the purpose for which the State intends to use such silence." *State v. Boston*, 191 N.C. App. 637, 648, 663 S.E.2d 886, 894, *appeal dismissed and disc. review denied*, 362 N.C. 683, 670 S.E.2d 566 (2008). This Court has previously explained that

a defendant's pre-arrest silence and post-arrest, pre-*Miranda* warnings silence may not be used as substantive evidence of guilt, but may be used by the State to impeach the defendant by suggesting that the defendant's prior silence is inconsistent with his present statements at trial. A defendant's post-arrest, post-*Miranda* warnings silence, however, may not be used for any purpose.

*State v. Mendoza*, 206 N.C. App. 391, 395, 698 S.E.2d 170, 174 (2010) (citations and internal quotation marks omitted).

In the present case, Robinson alleges two separate violations of his right to remain silent. First, he contends that the State repeatedly and impermissibly commented on his exercise of that right during cross-examination based on the following exchange:

> Q: Mr. Robinson, sir, after [Pelcher] tried to shoot and kill you with a gun, at what point did you report this assault on you to the police?
>
> A: Excuse me?
>
> Q: When did you call the police that you'd been assaulted with a gun?
>
> A: Why didn't I call the police?
>
> Q: Yes.
>
> A: He pulled a gun out on me.
>
> Q: Why didn't you call the police because you had to stab a man who pulled a gun out on you?
>
> A: Shoot—why I call the police? I mean, I'm not going to call the police when the man sit there and he trying to shoot

me.

…

Q: Well, when you saw a lot of blood from a man you had cut, why didn't you call the police and say, Hey, this man tried to shoot me?

A: I was scared.

Q: Scared of what?

A: Scared—scared—I just stabbed this man. First thing— first—my first reaction is that I'm going to go to jail.

Q: Well, your story to this jury is that this man was trying to assault you. Why didn't you tell the police that?

A: Why would I tell the police that when the police trying to look for me for assault with a deadly weapon with intent to kill?

Q: So, you had no thought of calling the police and telling this story that you're telling the jury to the police; is that correct?

A: No, I was already told—you know what I'm saying— make sure you tell your attorney, talk to him.

Q: Well, since June the 9th when this happened how many people have you told this story to about the drugs and being assaulted?

A: Talked to my attorney.

Q: Who else?

A: That's it.

Q: Nobody? Not one other person?

A: That's the only person I'm supposed to talk to is my attorney anyway—

Q: You didn't tell Tech?

A: —situation like this.

Q: You didn't tell Tech?

A: No, I ain't tell Tech nothing. Tech was with me. I don't even talk to Tech.

Q: You didn't tell your mother when you went to New York?

A: I didn't tell my mother? No, I didn't tell my mother nothing, you know what I'm saying? My mother already knew—it was when I went to New York. Yeah, I told her about—he tried to assault me with a gun. She knew—yeah, I mean, that's—of course that.

Q: So, when you went to New York you did tell your mother?

A: Yeah, I told my—yeah, I did tell my mother about he tried—he tried to shoot me with a gun, yeah.

Q: Well, where's your mother today?

A: She's in New York. She's at work.

Q: Who else besides your mother did you tell this story to?

A: That's it.

Q: Your mother and your lawyer?

A: Yes, sir.

Because Robinson failed to object to this line of questioning at trial, the standard of review is plain error.

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. . . . To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citation and internal quotation marks omitted). Thus, to prevail on this issue, Robinson must demonstrate that the errors he alleges were "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Brunson*, 187 N.C. App. 472, 477, 653 S.E.2d 552, 555 (2007) (citation omitted).

Robinson contends that the trial court committed plain error by allowing the State to cross-examine him about his failure to make any statement to law enforcement before trial. In support of this argument, Robinson cites our recent decision in *Richardson*. In *Richardson*, we granted a new trial to a defendant who had been convicted on two counts of assault with a deadly weapon with intent to kill inflicting serious injury in conjunction with a nightclub shooting based on our determination that it was plain error for the trial court to allow the State to cross-examine the defendant about his post-arrest, post-*Miranda* warning silence—specifically, the fact that his trial testimony constituted the first statement he had

made to authorities since the night of the shooting—while also stressing the fact that, unlike the defendant, other witnesses at the crime scene had given statements to investigating officers immediately after the shooting. *Richardson*, __ at __, 741 S.E.2d at 442-43.

Robinson argues that the same logic should apply here, but his reliance on *Richardson* is misplaced because *Richardson* is easily distinguished from the present facts insofar as our decision there was based on the State's express references on cross-examination to the defendant's *post*-arrest, *post-Miranda* silence, *see id.*, whereas here, the subject matter of the questions to which Robinson now objects clearly relates to his *pre*-arrest silence. Our Supreme Court has long recognized that "[t]he use of pre[-]arrest silence to impeach a defendant's credibility on cross-examination does not violate the Fifth or Fourteenth Amendment to the United States Constitution." *State v. Bishop*, 346 N.C. 365, 386, 488 S.E.2d 769, 780 (1997) (*citing Jenkins v. Anderson*, 447 U.S. 231, 65 L. Ed. 2d 86 (1980)). As this Court has explained,

> [w]hen a defendant chooses to testify in his own behalf . . . his [Fifth A]mendment right to remain silent must give way to the [S]tate's right to seek to determine, by way of impeachment, whether a defendant's prior silence is inconsistent with his trial testimony. The test is whether, under the circumstances at the time of arrest, it would have been natural for [the] defendant to have asserted the same defense asserted at trial.

*State v. McGinnis*, 70 N.C. App. 421, 424, 320 S.E.2d 297, 300 (1984) (citation omitted). In the present case, the State sought to impeach Robinson's credibility after he testified that he stabbed Pelcher in self-defense by pointing out that if his testimony were true, he would have had both the opportunity and the motive to share his version of the events with police, but instead fled to New York. This conduct, and the silence that accompanied it, all occurred before Robinson was ever arrested, advised of his *Miranda* rights, or had any contact whatsoever with law enforcement regarding the stabbing.

Robinson nevertheless insists that this line of questioning constituted an impermissible inquiry into his post-arrest silence based on the prosecutor's question: "Well, since June the 9th when this happened how many people have you told this story to about the drugs and being assaulted?" Robinson's argument here is that this question necessarily references periods of time after his extradition and arrest on 16 July 2013, and that it can be further inferred from his answers that he had already been advised of his *Miranda* rights by that time. Robinson again bases his argument on our decision in *Richardson*, where the defendant was arrested on the day of the offense—20 May 2009—and we held that "the prosecutor's questions about [the d]efendant's silence since May the 20th, 2009 clearly constituted an impermissible inquiry into [his] post-arrest silence" because "[t]he clear import of the prosecutor's questions was that, because [the d]efendant, unlike the other witnesses, chose not to

make a statement about the shooting until trial, his account of the incident was inherently less credible than that of the other witnesses." __ N.C. App. at __, 741 S.E.2d at 443. While there are certain similarities between the phrasing of the question we held violated the defendant's right to remain silent in *Richardson* and the question at issue here, our careful review of the trial transcript demonstrates important differences in the contexts in which these questions were asked.

Most notably, while it is beyond dispute that the impermissible question in *Richardson* addressed the defendant's post-arrest silence given its express reference to the date of his arrest and follow-up questions about his subsequent interviews with police, in the present case the State's question referenced the date of the stabbing and its follow-up questions dealt specifically with the conversations Robinson had with individuals—namely, Robinson's mother and his associate, Tech—who he interacted with before his extradition from New York, which means that the focus was still on Robinson's pre-arrest silence. Moreover, even assuming *arguendo* that the trial court erred because the prosecutor's admittedly clumsily phrased inquiry also encompasses Robinson's post-arrest silence, our prior decisions indicate that this error was harmless. Our General Statutes provide that "[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N. C. Gen.

Stat. § 15A–1443(b) (2013). This Court has repeatedly recognized that "[t]he test is whether the appellate court can declare a belief that there is no reasonable possibility that the violation might have contributed to the conviction." *State v. Shores,* 155 N.C. App. 342, 351-52, 573 S.E.2d 237, 242 (2002) (citation omitted), *disc. review denied,* 356 N.C. 690, 578 S.E.2d 592 (2003). In *Richardson,* we outlined several factors, "none of which should be deemed determinative," that "must be considered in ascertaining whether a prosecutorial comment concerning a defendant's post-arrest silence constitutes plain error," including:

> (1) whether the prosecutor directly elicited the improper testimony or explicitly made an improper comment; (2) whether the record contained substantial evidence of the defendant's guilt; (3) whether the defendant's credibility was successfully attacked in other ways in addition to the impermissible comment upon his or her decision to exercise his or her constitutional right to remain silent; and (4) the extent to which the prosecutor emphasized or capitalized on the improper testimony by, for example, engaging in extensive cross-examination concerning the defendant's post-arrest silence or attacking the defendant's credibility in closing argument based on his decision to refrain from making a statement to investigating officers.

__ N.C. App. at __, 741 S.E.2d at 442. In the present case, we conclude that even if we broadly construe the prosecutor's question about who Robinson had told his version of events to "since June the 9th" as an impermissible comment on Robinson's post-arrest silence, a full analysis of each factor requires a finding that the trial court did not commit plain error. On the one hand, as discussed *supra,* the record contained

substantial evidence of Robinson's guilt. To wit: while there is no dispute that Robinson caused serious injuries to Pelcher when he stabbed him five times with his brass knuckle-handled pocketknife before fleeing the scene and leaving the state, the record is devoid of any evidence to support Robinson's claims that Pelcher had a gun, that Pelcher threatened him with a gun, and that Robinson was also injured when the two men scuffled. On the other hand, any fleeting reference to Robinson's post-arrest silence is far outweighed by the extent of the State's cross-examination that focused on impeaching Robinson based on his pre-arrest silence and conduct. Furthermore, unlike in *Richardson*, where the prosecutor's questions about the defendant's post-arrest silence focused extensively on his refusal to give a statement during a post-arrest interview with a detective, here, viewing the record in its full context, we find a more benign motivation for the State's efforts to impeach Robinson's credibility by highlighting the fact that he had never previously mentioned that the stabbing was in self-defense. Specifically, Robinson's trial counsel cross-examined Pelcher at great length about purported inconsistencies between his testimony at trial and his prior statements to law enforcement about the stabbing. Thus, the State's question about how many people Robinson had told his side of the story to since the date of the stabbing is best viewed not as an impermissible inquiry into his post-arrest silence but instead as a legitimate means of impeaching Robinson's credibility by demonstrating for the jury the fact that his testimony could

not be similarly impeached by prior inconsistent statements because he had never made any prior statements to compare it against.

Robinson argues further that the State clearly attempted to capitalize on this improper line of questioning by emphasizing it during closing arguments, but this argument fails for similar reasons because our review of the record makes clear that although the State did attack Robinson's credibility during its closing argument, its basis for doing so was not Robinson's "decision to refrain from making a statement to investigating officers," *see id.*, but was instead for the proper impeachment purposes already discussed. We therefore conclude that the trial court did not commit plain error by allowing this line of questioning on cross-examination.

Finally, Robinson also argues that the trial court erred in failing to intervene *ex mero motu* when the State revisited these themes during its closing argument. The standard of review when a defendant fails to object at trial is

> whether the [closing] argument complained of was so grossly improper that the trial court erred in failing to intervene *ex mero motu*. In determining whether the prosecutor's argument was . . . grossly improper, this Court must examine the argument in the context in which it was given and in light of the overall factual circumstances to which it refers. The impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. McCollum*, 177 N.C. App. 681, 685, 629 S.E.2d 859, 861-62 (2006) (citations, internal quotation marks, brackets, and emphasis omitted), *disc. review denied*, 361 N.C. 365, 646 S.E.2d 534 (2007). Here, Robinson claims the State impermissibly commented on his silence during its closing argument when the prosecutor told the jury that "it would have been nice if I had had a person such as [Robinson's] mother or any person who since June the [ninth] of last summer he had told this story to besides you jurors today. There is no other person. He has not told any other person." He also complains of the prosecutor's statement to the jury that "[Robinson] can tell you anything he wants to tell you, because he's never told this story to any other person," as well as the prosecutor's statement that

> [t]hat is the issue, what was his intent. If you take that element out, let's say you've heard everything, 12 people certainly smarter than I am, they could come up with some other reason why he would cut this man and stab this man in this way and conduct himself, Mr. Robinson that is, during and after the incident in the way he did by fleeing, not reporting to police—staying gone as long as he could and leaving the State.

In light of the preceding analysis and taken in context with the record as a whole, we conclude that the trial court did not err in failing to intervene *ex mero motu*. When read together, the first two statements refer not to Robinson's post-arrest silence but instead to the fact that, unlike Pelcher, who Robinson's attorney repeatedly questioned about his own prior inconsistent statements, Robinson could not be similarly impeached because there was nothing to compare his testimony against.

The third statement clearly refers to Robinson's pre-arrest conduct and silence. All three of these statements are rooted in questions that were properly used to impeach Robinson on cross-examination and, unlike in *Richardson*, none of them specifically reference Robinson's decision to exercise his right to remain silent in the face of questions from investigators. Thus, as discussed *supra*, even assuming *arguendo* that the trial court erred because the first two statements could, if construed broadly, be found to impermissibly refer to Robinson's post-arrest silence, our analysis of the factors articulated in *Richardson* demonstrates that the State's closing argument was not so grossly improper as to require a finding by this Court that the trial court abused its discretion in not recognizing and correcting it *ex mero motu*. Accordingly, we hold Robinson's arguments that he is entitled to a new trial due to violations of his Fifth and Fourteenth Amendment rights are without merit.

NO PREJUDICAL ERROR.

Judges HUNTER, JR., and TYSON concur.

Report per Rule 30(e).